~~SECRET~~                                    ~~SECRET~~

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 15, 2011            Decided October 14, 2011
                                 Reissued April 27, 2012

No. 10-5319

ADNAN FARHAN ABDUL LATIF, DETAINEE, CAMP DELTA, ET
AL.,
APPELLEES

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:04-cv-01254)

*August E. Flentje*, Attorney, U.S. Department of Justice,
argued the cause for appellants. With him on the briefs were
*Ian Heath Gershengorn*, Deputy Assistant Attorney General,
and *Robert M. Loeb*, Attorney.

*Philip A. Scarborough* argued the cause for appellees.
On the brief were *S. William Livingston, Roger A. Ford*, and
*David H. Remes. Brian E. Foster* entered an appearance.

Before: HENDERSON, TATEL and BROWN, *Circuit Judges*.

~~SECRET~~ 2 ~~SECRET~~

Opinion for the Court filed by *Circuit Judge* BROWN.

Concurring opinion filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* TATEL.

BROWN, *Circuit Judge*: The United States appeals the district court's grant of the writ of habeas corpus to detainee Adnan Farhan Abd Al Latif. Three errors in the district court's analysis require us to vacate that decision. First, the court failed to accord an official government record a presumption of regularity. Second, the district court failed to determine Latif's credibility even though the court relied on his declaration to discredit the Government's key evidence. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1110 (D.C. Cir. 2010). Third, the court's unduly atomized approach to the evidence is one we have rejected. *See id.* We remand so the district court can evaluate Latif's credibility as needed in light of the totality of the evidence, including newly available evidence as appropriate.

I

Latif is a Yemeni national who was apprehended near Pakistan's Afghan border in late 2001 and transferred to Guantanamo Bay in January 2002. The parties agree that Latif commenced his travels at the suggestion of a man named Ibrahim and that Latif set off from Yemen to Quetta, Pakistan, and from there to Kabul, Afghanistan. The parties also agree that after returning to Pakistan, Latif was seized by the Pakistani military without a passport. What the parties disagree about is the nature of Latif's trip. The Government says Latif was recruited and trained by the Taliban and then was stationed in Kabul on the front line against the Northern

Alliance. Latif says he left Yemen in search of medical care and has never had anything to do with the Taliban.

The Government's case against Latif is based on a heavily redacted ████████ ("Report")

████████████
████████████
████████ According to the story attributed to Latif in the Report, Ibrahim Al-Alawi began recruiting Latif for jihad in 2000. At Ibrahim's urging, Latif left home in early August 2001 and travelled to Afghanistan via Sana'a, Yemen; Karachi, Pakistan; and Quetta, Pakistan. Latif met Ibrahim at the Grand Mosque in Kandahar, Afghanistan, and stayed with him and his family for three days. From Kandahar, Ibrahim took Latif to the Taliban. The Taliban gave him weapons training and stationed him on the front line against the Northern Alliance, north of Kabul, under the command of Afghan leader Abu Fazl. While there, Latif reportedly "saw a lot of people killed during the bombings, but never fired a shot." While with the Taliban, Latif met Abu Hudayfa of Kuwait, Abu Hafs of Saudi Arabia, and Abu Bakr of the United Arab Emirates or Bahrain. Latif retreated to Pakistan via Jalalabad with fleeing Arabs, guided by an Afghan named Taqi Allah.

Among other un-redacted identifying details, the Report indicates that Latif's mother's name is Muna, that he lived in the village of 'Udayn in Ibb, Yemen, and that his only prior trip out of that country was to Jordan with a friend "for medical treatment of an injury to his hand." ████ In the district court, the Government did not produce the notes on which this Report was based. The Government now claims to have located the notes, which it

SECRET 4 SECRET

says confirm the Report. Since this case was briefed, those notes have been disclosed to Latif's counsel in some form.

Latif does not deny being interviewed ███████████. ████████████ Nor does he allege his statements were coerced or otherwise involuntary. But Latif says his statements were misunderstood or, alternatively, ███████ ████████████████ were misattributed to him. In a declaration filed with the district court in 2009, Latif denies ever being part of the Taliban and offers an innocent explanation for his journey. Latif says he left Yemen in 2001 on a quest for medical treatment for head injuries he suffered in a 1994 car accident. He went to Pakistan to get help from Ibrahim, a Yemeni he had met at a charitable organization in Yemen. When Latif arrived in Quetta, Ibrahim had already left Pakistan, so Latif followed him to an Islamic studies institute in Kabul, Afghanistan. But once Latif caught up to Ibrahim at the institute, Ibrahim had to leave again and told Latif to wait for him there until they could travel together to Pakistan. After waiting in vain for several weeks, Latif says, he then returned to Pakistan without Ibrahim, fleeing U.S.-supported forces he had been told were advancing from northern Afghanistan.

The district court granted Latif's habeas petition following briefing and a hearing in which Latif declined to testify. *Abdah v. Obama (Latif)*, 2010 U.S. Dist. LEXIS 83596 (D.D.C. July 21, 2010). Although it did not "disregard" the Report entirely, slip op. at 26, the district court concluded it could not "credit that information because there is serious question as to whether the [Report] accurately reflects Latif's words, the incriminating facts in the [Report] are not corroborated, and Latif has presented a plausible alternative story to explain his travel." *Id.*

~~SECRET~~ 5 ~~SECRET~~

## II

In a Guantanamo detainee case, we review the district court's "specific factual determinations" for clear error, and its ultimate grant or denial of habeas *de novo*. *Almerfedi v. Obama*, — F.3d —, 2011 U.S. App. LEXIS 11696, at *11 (D.C. Cir. June 10, 2011). As in our prior cases, we assume, without deciding, that the district court was correct to hold the Government to the preponderance-of-the-evidence standard. *See id.* at 11 n.4; *Al-Bihani v. Obama*, 590 F.3d 866, 878 & n.4 (D.C. Cir. 2010); *see also Boumediene v. Bush*, 553 U.S. 723, 787 (2008) ("The extent of the showing required of the Government in these cases is a matter to be determined."); *Al-Adahi*, 613 F.3d at 1105 ("Although we doubt ... that the Suspension Clause requires the use of the preponderance standard, we will not decide the question in this case."). To meet its burden, "the government must put forth credible facts demonstrating that the petitioner meets the detention standard, which is then compared to a detainee's facts and explanation." *Almerfedi*, — F.3d —, 2011 U.S. App. LEXIS 11696, at *12–13.

At the heart of the Government's case is the Report in which Latif reportedly admitted being recruited for jihad, receiving weapons training from the Taliban, and serving on the front line with other Taliban troops. Latif's whole defense is that this official government record is unreliable—in other words, that the Government botched it. Latif says his interrogators ███████████████████ so garbled his words that their summary bears no relation to what he actually said. Latif's case turns on this claim, because if the Report is an accurate summary of what Latif told his interrogators, then his detention is lawful. On this we all agree. *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 26; *accord* Dissenting Op. at 2-3. The district court says

~~SECRET~~ 6 ~~SECRET~~

it did not altogether disregard the Government's evidence, slip op. at 26, and for good reason: the Report has more than sufficient indicia of reliability to meet the Government's "minimum threshold of persuasiveness." *Almerfedi*, — F.3d —, 2011 U.S. App. LEXIS 11696, at *13.

Ordinarily, at this point in our analysis, we would simply review the district court's comparison of the Government's evidence with the "detainee's facts and explanation," bearing in mind that the ultimate burden is on the Government to establish Latif's detention is legal. *Id.* We pause here, however, because the district court expressly refused to accord a presumption of regularity to the Government's evidence, and on appeal the Government continues to assert its Report is entitled to such a presumption.

A

"The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1105, 1117 (D.C. Cir. 2007). The presumption applies to government-produced documents no less than to other official acts. *See Riggs Nat'l Corp. v. Comm'r*, 295 F.3d 16, 21 (D.C. Cir. 2002) (holding that "an official tax receipt" of a foreign government "is entitled to a presumption of regularity"). But Latif (and our dissenting colleague) argue no such presumption can be applied in Guantanamo cases—at least not to interrogation reports prepared in stressful and chaotic conditions, filtered through interpreters, subject to transcription errors, and heavily redacted for national security purposes.

~~SECRET~~ 7 ~~SECRET~~

Since the problems Latif cites are typical of Guantanamo detainees' interrogation reports, the rule he proposes would subject all such documents to the he-said/she-said balancing of ordinary evidence. It is impossible to cure the conditions under which these documents were created, so Latif's proposed rule would render the traditional presumption of regularity wholly illusory in this context. We conclude first that intelligence documents of the sort at issue here are entitled to a presumption of regularity, and second that neither internal flaws nor external record evidence rebuts that presumption in this case.

Courts sensibly have anticipated that some sort of presumption is proper in the Guantanamo, but until now we have not directly addressed the question. The dissent interprets our silence heretofore as disapproval and suggests that a presumption in favor of the Government's evidence in this case "inappropriately shift[s] the burden" of proof from the Government to the detainee. Dissenting Op. at 30. A Supreme Court plurality said just the opposite, however—and in a case involving the military detention of an American citizen, no less:

> [T]he Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria.

*Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004).

When the Supreme Court extended the habeas right to non-citizen detainees in 2008, it tasked the lower courts with developing a workable habeas remedy that would give detainees a "meaningful opportunity to demonstrate" the unlawfulness of their detention, *Boumediene*, 553 U.S. at 779, yet it left unaddressed the content of the governing law, *id.* at 798. *Boumediene* noted that "common-law habeas corpus was, above all, an adaptable remedy" whose "precise application and scope changed depending upon the circumstances." *Id.* at 779. Our dissenting colleague seems to think *Boumediene* mandates a skeptical—if not cynical—supervisory role for the courts over the Executive branch's interactions with its detainees at Guantanamo. Dissenting Op. at 7. In our view, the *Boumediene* Court envisioned a much more modest judicial role. Aside from a few minimal procedural safeguards, designed to preclude the Government acting as its own judge,[1] the Court left the scope of the habeas right to the common-law-like process in which we have been engaged ever since: "[T]he Suspension Clause does not resist innovation in the field of habeas corpus. Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ." *Boumediene*, 553 U.S. at 795.

---

[1] Specifically, the Supreme Court held that Guantanamo detainees must have "the means to supplement the record on review," *Boumediene*, 553 U.S. at 786, and that the court conducting habeas proceedings must have authority (1) "to assess the sufficiency of the Government's evidence against the detainee," *id.*; (2) "to admit and consider relevant exculpatory evidence," *id.*; (3) "to make a determination in light of the relevant law and facts," *id.* at 787; and (4) "to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release," *id.*

In that spirit, the district court has operated under a case management order that specifically authorized reliance on evidentiary presumptions. *See In re Guantanamo Bay Detainee Litig.*, 2008 U.S. Dist. LEXIS 97095, at \*104 (D.D.C. Nov. 6, 2008) ("The Merits Judge may accord a rebuttable presumption of accuracy and authenticity to any evidence the government presents as justification for the petitioner's detention if the government establishes that the presumption is necessary to alleviate an undue burden presented by the particular habeas corpus proceeding."). The Government has frequently invoked this order in urging a presumption that its evidence is accurate, but the district court, with no guidance from us, has been reluctant to grant anything more than a presumption of authenticity. *See* BENJAMIN WITTES, ROBERT M. CHESNEY & LARKIN REYNOLDS, *The Emerging Law of Detention 2.0: Guantánamo Habeas Cases as Lawmaking*, at 52–53 nn. 237–43 (May 12, 2011) (citing cases granting a presumption of authenticity but not accuracy), http://www.brookings.edu/papers/2011/05_guantanamo_witte s.aspx (last visited September 30, 2011). Aside from our silence, there are at least two other reasons why the district court has not applied a presumption of accuracy.

Confusion about the nature of the presumption may account for the district court's reluctance. In an order applicable to the present case, the district court held, "any evidence presented by the government that has been created and maintained in the ordinary course of business should be afforded a presumption of authenticity," Dist. Ct. Docket No. 606, but the court rejected the government's request for a presumption of accuracy "for the reasons stated by Judge Kessler in *Ahmed v. Obama*, 613 F. Supp. 2d 51, 54–55 (D.D.C. 2009) and Judge Kollar-Kotelly in *Al Mutairi v.*

~~SECRET~~ 10 ~~SECRET~~

*United States*, [644 F. Supp. 2d 78 (D.D.C. July 29, 2009)]." *Id.* Those cases misunderstood the nature of the presumption. In *Ahmed* and *Al Mutairi*, the district court assumed the requested presumption would go to the truth of "the facts contained in the Government's exhibits." *Ahmed*, 613 F. Supp. 2d at 55. Since "the accuracy of much of the factual material contained in the [Government's] exhibits [was] hotly contested," *id.*, *quoted in Al Mutairi*, 644 F. Supp. 2d at 84, and the evidentiary dispute in *Ahmed* involved allegations that the relevant statements were "obtained by torture," *Ahmed*, 613 F. Supp. 2d at 55, the court was rightly disinclined to grant them a presumption of *truth*. But the presumption of regularity does not require a court to accept the truth of a non-government source's statement.

The confusion stems from the fact that intelligence reports involve two distinct actors—the non-government source and the government official who summarizes (or transcribes) the source's statement. The presumption of regularity pertains only to the second: it presumes the government official accurately identified the source and accurately summarized his statement, but it implies nothing about the truth of the underlying non-government source's statement. There are many conceivable reasons why a government document might accurately record a statement that is itself incredible. A source may be shown to have lied, for example, or he may prove his statement was coerced. The presumption of regularity—to the extent it is not rebutted—requires a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove.

Another reason the district court has denied the Government's motions for a presumption of accuracy may be that such a presumption is often unnecessary or irrelevant.

The Government has frequently been able to prove its detention authority without relying on any presumption that its records are accurate. And in many cases, detainees do not challenge the Government's recordkeeping. Instead, they attack the sufficiency of the evidence, or they claim that the Government's information is unreliable because it resulted from harsh interrogation techniques, multiple levels of hearsay, or unknown sources.

This case presents a different question because Latif's sole challenge is to the accuracy of the Government's summary of his own words. When the detainee's challenge is to the evidence-gathering process itself, should a presumption of regularity apply to the official government document that results? We think the answer is yes.

To forbid a presumption of regularity in spite of *Boumediene*'s implicit invitation to innovate, 553 U.S. at 795, would be particularly counterintuitive, since the field of habeas corpus is already well accustomed to such burden-shifting presumptions. In a state prisoner's federal habeas proceeding, for example, "a determination of a factual issue made by a State court shall be presumed to be correct," and "the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Al-Bihani*, 590 F.3d at 878. And after a state court conviction becomes final, it is subject to a "presumption of regularity," such that "[i]f that conviction is later used to enhance a [federal] criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained." *Lackawanna Cty. Dist. Att'y v. Coss*, 532 U.S. 394,

403–04 (2001); *see also Parke v. Raley*, 506 U.S. 20, 30 (1992) (same for enhancement of a state court sentence).[2]

Just as principles of vertical comity and federalism justify presumptions in favor of state court judgments in ordinary criminal habeas proceedings, *see Sumner v. Mata*, 449 U.S. 539, 547 (1981), the horizontal separation of powers justifies a presumption in favor of official Executive branch records in Guantanamo habeas proceedings. The district court is uniquely qualified to determine the credibility of hearsay, and the presumption of regularity does not detract from that role. But courts have no special expertise in evaluating the nature and reliability of the Executive branch's wartime records. For that, it is appropriate to defer to Executive branch expertise. *See Boumediene*, 553 U.S. at 796-97 ("In

---

[2] Even the particular presumption at issue in this case—the presumption that an official government record was accurately produced—applies in ordinary criminal habeas cases. *See Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985) ("Official records, such as this signed [state court guilty plea], are entitled to a presumption of regularity and are accorded great evidentiary weight" in a federal habeas proceeding.); *see also Walker v. Maggio*, 738 F.2d 714, 717 (5th Cir. 1984) ("minute entry of the [state] court" is entitled to a "presumption of regularity"); *Thompson v. Estelle*, 642 F.2d 996, 998 (5th Cir. 1981) ("The district court could properly rely on the regularity of the state court's documents in preference to Thompson's own self-serving testimony."); *Webster v. Estelle*, 505 F.2d 926, 929-30 (5th Cir. 1974) (indictment and docket sheet are entitled to presumption of regularity). The same presumption applies to official government records in a probation revocation proceeding, a circumstance like habeas in which liberty is on the line. *See United States v. Thomas*, 934 F.2d 840, 846 (7th Cir. 1991) (probation officer's report); *United States v. Verbeke*, 853 F.2d 537, 539 (7th Cir. 1988) (treatment center's report); *United States v. Callum*, 677 F.2d 1024, 1026 (4th Cir. 1982) (same).

~~SECRET~~                13                ~~SECRET~~

considering both the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches."). Both the Constitution and common sense support judicial modesty when assessing the Executive's authority to detain prisoners during wartime, for it is an area in which the judiciary has the least competence and the smallest constitutional footprint.

Our dissenting colleague concludes the presumption of regularity should not extend to official intelligence reports because he imagines the presumption of regularity is just a shortcut for crediting the work product of official processes we know to be "transparent, accessible, and often familiar," Dissenting Op. at 3, and because he thinks we know relatively little about how intelligence reports are created, *id.* at 4-5. Both premises are false. Courts regularly apply the presumption to government actions and documents that result from processes that are anything but "transparent," "accessible," and "familiar." The presumption of regularity is founded on inter-branch and inter-governmental comity, not our own judicial expertise with the relevant government conduct. In *Riggs National,* we presumed a foreign government entity's receipt to be reliable without pretending it was produced by a "familiar" or "transparent" process. *Id.* at 3; *see* 295 F.3d at 20–22. Likewise, federal courts need no expertise concerning the procedures of state courts, probation offices, and drug treatment centers to afford their official records a presumption of regularity. *See* cases cited *supra* note 2. Thanks to the explanatory declarations ███████ ███████ which we discuss below, *see infra* at 21-22, we know far more about the personnel, process, and standards involved in producing intelligence records like the Report than we do about the foreign and state governmental organs whose records we also presume to be reliable, and we have no

SECRET  14  SECRET

reason to suspect such documents are fundamentally unreliable.[3]

Rather than cast doubt on the viability of the presumption of regularity in this context, our only pertinent post-*Boumediene* discussion of the presumption strongly suggests its continuing viability. In *Al-Bihani*, the detainee complained that the district court had "erred by ... presuming the accuracy of the government's evidence." 590 F.3d at 875. Without isolating the components of Al-Bihani's multifaceted procedural argument—it included attacks on the standard of review, the denial of a full-blown evidentiary hearing, alleged burden-shifting, and the district court's discovery orders—we said that his "argument clearly demonstrate[d] [his own] error" and that *Boumediene*'s holding had placed it on "shaky ground." *Id.* at 876. Without explicitly confirming that the district court had applied a presumption in favor of the Government's evidence in that case, we noted that its case management order "reserved the district court's discretion, when appropriate, to adopt a rebuttable presumption in favor of the accuracy of the government's evidence." *Id.* at 869–70. We implied that the district court had in fact exercised this discretion when we quoted the order with approval in our hearsay analysis. *Id.* at 880 ("[T]he Court will determine, as to any evidence introduced by the Government, whether a presumption of accuracy and/or authenticity should be accorded."). Consistent with this order, we noted, the district

---

[3] When Latif's first interrogation took place and the Report was prepared, the Government had no expectation that its intelligence would be used in litigation. Instead, the Government was seeking accurate, actionable intelligence to protect the country from imminent attack. The Government had the strongest incentive to produce accurate reports and no incentive to frame innocent bystanders as Taliban operatives.

court had judged the "admissions presented by the government to be 'credible and consistent.'" *Id.* Indeed, the district court relied on "certain statements by the petitioner that the Court finds credible and certain classified documents" without entertaining the possibility that the detainee's statements had been mis-reported. *Al Bihani v. Obama*, 594 F. Supp. 2d 35, 38-39 (D.D.C. 2009). We did not distinguish the presumption of regularity from the admission of hearsay evidence generally, but we noted that "had the district court imposed stringent standards of evidence in the first instance, the government may well have been obligated to go beyond Al-Bihani's interrogation records and into the battlefield to present a case that met its burden," *Al Bihani*, 590 F.3d at 877–78, and we "disposed of" "[t]he rest of Al-Bihani's procedural claims . . . without extended discussion," *id.* at 881. Although *Al-Bihani* does not clearly hold the district court may accord government evidence a presumption of regularity, that case is certainly consistent with today's holding.

Although it was decided under the pre-*Boumediene* Detainee Treatment Act of 2005 (DTA), our opinion in *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008), also lends support to the continuing viability of such a presumption. In *Parhat*, we noted that the DTA incorporated by reference a "*rebuttable* presumption that the Government Evidence is genuine and accurate." *Id.* at 847 (quotation marks omitted) (quoting Implementation of Combatant Status Review Tribunal Procedures at E-1 § G(11) (July 29, 2004)). We reversed the Tribunal's decision because the Government's evidence, despite the presumption in its favor, could not "sustain the determination that Parhat is an enemy combatant." 532 F.3d at 847. The intelligence consisted of anonymous hearsay in the form of unsupported "bottom-line assertions," so it was impossible for us to "assess the

SECRET 16

reliability of the assertions in the documents." *Id.* We explained that "[i]f a Tribunal cannot assess the reliability of the government's evidence, then the 'rebuttable' presumption becomes effectively irrebuttable." *Id.* Although we found the presumption rebutted in *Parhat*, we cast no doubt on the propriety of such a presumption in the Guantanamo context. *Parhat* still "sets the guideposts for our inquiry into the reliability of the [Government's] evidence in a detainee's habeas case." *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010) (quoting *Barhoumi v. Obama*, 609 F.3d 416, 428 (D.C. Cir. 2010)). And neither the Supreme Court nor our court has ever rejected the presumption we analyzed in that case.

Our dissenting colleague points to four more recent cases to defend his view that intelligence documents like the Report in this case are undeserving of a presumption of regularity. Dissenting Op. at 10–12 (citing *Barhoumi*, 609 F.3d 416, *Bensayah*, 610 F.3d 718, *Al Alwi v. Obama*, — F.3d —, No. 09-5125, 2011 U.S. App. LEXIS 14991 (D.C. Cir. July 22, 2011), and *Khan v. Obama*, — F.3d —, No. 10-5306, 2011 U.S. App. LEXIS 18471 (D.C. Cir. Sept. 6, 2011)). But we had no occasion to apply such a presumption in any of these cases, and none of them limits our discretion to do so under *Boumediene*.

In *Barhoumi*, we considered a Government intelligence report containing a translation of a diary. Although we affirmed the district court's favorable treatment of the Government's evidence, 609 F.3d at 428–31, we did not apply a presumption of regularity. The reason for that omission is simple. The district court had credited the Government's evidence without applying a presumption of regularity, and we were reviewing for clear error. *See* Brief of Respondents-Appellees at 52, *Barhoumi*, 609 F.3d 416 (No.

~~SECRET~~ 17 ~~SECRET~~

09-5383), ECF No. 1236093 (observing that "the district court did not presume the accuracy or authenticity of the government's evidence"). True, the Government's brief interpreted the criminal cases on which Barhoumi relied as "acknowledg[ing] that, absent 'unusual circumstances,' a translation is assumed to be accurate" in "criminal proceedings governed by the Confrontation Clause and the Federal Rules of Evidence." *Id.* at 45–46 (quoting *United States v. Martinez Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000) and *United States v. Vidacek*, 553 F.3d 344, 352 (4th Cir. 2009)). But the Government did not ask us to apply any such presumption to its evidence. Indeed, the Government noted those criminal cases were "clearly distinguishable." *Id.* at 45. We agreed. The cases Barhoumi relied on related to the question of admissibility, which we observed was irrelevant in the Guantanamo habeas context since all hearsay is admissible. We *rejected* the detainee's contention that deficiencies in the translation rendered it unreliable. *See Barhoumi*, 609 F.3d at 431. We certainly did not deny the possibility that a presumption of accuracy might apply in the habeas context—we simply were not confronted with that question. Our opinion in *Barhoumi* therefore cannot bind us to the dissent's view that the constitutional right to habeas precludes any presumption in favor of an official intelligence report. "Constitutional rights are not defined by inferences from opinions which did not address the question at issue." *Texas v. Cobb*, 532 U.S. 162, 169 (2001); *see also Lopez v. Monterey Cty*, 525 U.S. 266, 281 (1999) ("[T]his court is not bound by its prior assumptions."); *cf. Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1448-49 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed. The Court would risk error if it relied on assumptions that have gone unstated and unexamined." (citations omitted)); *Brecht v. Abrahamson*,

507 U.S. 619, 631 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed the applicability of the *Chapman* ['harmless beyond a reasonable doubt'] standard on habeas, we are free to address the issue on the merits.").

For the same reason, we cannot extract from *Bensayah*, *Al Alwi*, or *Khan* the dissent's proposed bar on evidentiary presumptions for intelligence reports. As in *Barhoumi*, the Government did not request a presumption of regularity in any of these appeals. *See* Brief of Respondents-Appellees at 38–39, *Bensayah*, 610 F.3d 718 (No. 08-5537); Brief of Respondents-Appellees at 34–38, *Al Alwi*, — F.3d — (No. 09-5125); Brief of Respondents-Appellees at 45–58, *Khan*, — F.3d — (No. 10-5306). Thus, the court appropriately refrained from addressing the viability of such a presumption in each of those cases. *See Rumber v. District of Columbia*, 595 F.3d 1298, 1302 (D.C. Cir. 2010) ("[W]e follow our usual practice of declining to reverse the district court based on arguments that the appellant did not raise."); *United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000) ("Because [the defendant] failed to preserve the argument for appeal, we review . . . *at most* for plain error." (emphasis added)). Absent relevant arguments, none of these cases can be read to foreclose a presumption of regularity for government documents in general or intelligence reports in particular.

Apart from its precedential argument, the dissent frets that "in practice" the presumption of regularity will compel courts to rubber-stamp government detentions because it "suggest[s] that whatever the government says must be treated as true." Dissenting Op. at 19 (quoting *Parhat*, 532 F.3d at 849). That fear is unfounded. Again, the presumption of regularity, if not rebutted, only permits a court to conclude that the statements in a government record were actually

made; it says nothing about whether those statements are true. And while the presumption applies to government records, it does not apply only to the government's evidence. If a detainee introduces a government record to support his side of the story–as has been done in the past, *see, e.g., Awad*, No. 09-5351, slip op. at 8 ("In support of his petition, Awad introduced into evidence . . . additional statements he made to his interrogators")–he can benefit from the presumption as well. Finally, the presumption likely will never play a larger role in the resolution of a case than it does here (because the reliability of the Report is the central dispute), and even here, the presumption is not dispositive.

A body of judge-made law is not born fully formed, like Athena from the head of Zeus. It grows gradually, developing little by little in response to the facts and circumstances of each new case. Until now, we have not had to decide whether the common-law presumption of regularity applies in Guantanamo habeas proceedings. This case finally forces the issue because Latif challenges only the reliability of the Report, and because the Government persists in its request for a presumption of regularity on appeal.[4] We hold that in

---

[4] The Government's argument for a presumption of regularity is unambiguous. Observing that "[i]t is well established that there is a strong 'presumption of regularity' for actions of government officials taken in the course of their official duties," Appellants' Br. 30 (quoting *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14– 15 (1926), the Government argued that the expert descriptions ███ ████████████████████████████████ "should have been considered in light of the general presumption that government officials are properly carrying out their duties." *Id.* Developing this argument by analogy, the Government urged that "the factors supporting [the] accuracy" of ███ screening interview reports are "even stronger than in the immigration context" in which a border agent "cannot be presumed to be . . . other than an accurate recorder" of the alien's statement. *Id.* at 30–31 (quoting *Espinoza v.*

Guantanamo habeas proceedings a rebuttable presumption of regularity applies to official government records, including intelligence reports like the one at issue here.

## B

Because the Report is entitled to a presumption of regularity, and because the Report, if reliable, proves the lawfulness of Latif's detention, we can only uphold the district court's grant of habeas if Latif has rebutted the Government's evidence with more convincing evidence of his own.[5] Viewed together, both the internal flaws Latif identifies in the Report and the other evidence he uses to attack its reliability fail to meet this burden.

---

*INS*, 45 F.3d 308, 311 (9th Cir. 1995)). The dissent's claim that our holding goes "well beyond what the government actually argues in its briefs" is unfounded. Dissenting Op. at 9.

[5] We need not decide precisely how much more the detainee must show to overcome the presumption of regularity. Depending on the circumstances, courts have required litigants to meet standards ranging from "clear and specific evidence," *Riggs Nat'l*, 295 F.3d at 21 (tax), to "clear and convincing evidence," *Riggins v. Norris*, 238 F.3d 954, 955 (8th Cir. 2001) (habeas); *see also United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("clear evidence") (selective prosecution); *Dep't of Labor v. Triplett*, 494 U.S. 715, 723 (1990) ("[A]necdotal evidence will not overcome the presumption of regularity") (effective assistance of counsel); *cf. Sussman*, 494 F.3d at 1117 (noting a "less stringent standard" applies in at least some FOIA cases (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004))). Even if we assume a detainee may overcome the presumption by a mere preponderance of the evidence, Latif cannot meet that standard.

SECRET 21 SECRET

We begin our rebuttal analysis with the Report itself, because Latif alleges that intrinsic flaws in the document undermine its reliability. The Report bears every indication of being what the Government says it is ███████████

███████ Some of the information gleaned from Latif's interview is redacted, including information about █████ the name of a friend who accompanied him to Jordan for medical treatment.

Despite its redactions, the Report permits the assessment of reliability we demanded in *Parhat.* 532 F.3d at 847. The Report is identified

SECRET           22           SECRET

These general descriptions seem to be consistent with the specific document at issue in this case. Critically, the Report purports to summarize an actual interview with Latif himself—not the anonymous hearsay we rejected in *Parhat.* *Cf. id.* at 846–47.[6] Rather than "bottom-line assertions," *id.* at 847, the Report tells a story that a court can evaluate for internal consistency, and for consistency with other evidence. And the Report includes enough biographical information to support an inference that Latif was indeed the subject of the interview. Although the Report bears ████████

---

[6] The dissent repeats a criticism of the Report that we have already rejected for similar documents—namely, that it is inherently unreliable because it "contain[s] multiple layers of hearsay." Dissenting Op. at 9. As we clarified in *Al-Bihani,* however, an interrogation report involves just one level of hearsay—that of the interrogator. 590 F.3d at 879. Like the diary translated in *Barhoumi,* and unlike the anonymous hearsay in *Parhat,* Latif's statements to the interrogator *are* "the underlying reporting on which the government's assertions are founded." *Barhoumi,* 609 F.3d at 428. The act of translation "does not affect [an interrogation report's] status." *Al-Bihani,* 590 F.3d at 879; *see Barhoumi,* 609 F.3d at 430–31. And, as *Parhat* and *Al-Bihani* demonstrate, courts are capable of determining whether official government records that contain hearsay merit the presumption of regularity.



In his attack on the reliability of the Government's evidence, Latif relies heavily on ███ apparent transcription errors in the Report—an ambiguous reference to the injury that necessitated his trip to Jordan in 1994, ███████████ ██████████████████████████████████ ████████████████ Though purporting not to disregard the Report entirely, the district court reasoned these errors support "an inference that poor translation, sloppy note taking, ██████████████████████ ████████████ or some combination of those factors resulted in an incorrect summary of Latif's words." *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 26. The court's inference was insufficient to overcome the presumption of regularity. Neither of these alleged flaws in the Report proves the separate statements connecting Latif to the Taliban are fundamentally inaccurate.

Latif argues that the Report misstates whose injury was the reason for the trip to Jordan. Latif's medical records confirm that Yemen's Ministry of Defense paid for him to receive medical treatment in Jordan for a head injury. The Report says, "[Latif's] only previous travel was to Jordan,

accompanying . . . a friend injured during the Yemeni civil war, for medical treatment of an injury to *his* hand." ███████ ███████ (emphasis added). Latif reads "his" as a reference to his friend and points to this as proof that the Report is unreliable. But the pronoun is ambiguous—it lacks a clear antecedent. The district court seems to have been persuaded by *both* interpretations, faulting the Report for referring to the friend's injury, not Latif's; but also assuming the Report referred to Latif's hand, not his friend's. *See Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 15. Whichever reading of the ambiguous sentence is correct, any mistake, if there is one, is consistent with a minor error in transcription or pronoun usage. A note-taker in the field could easily have misheard the translator and written "hand" instead of the similar-sounding monosyllable "head." We need not consider whether the district court's speculation was clearly erroneous, because neither a grammatical ambiguity nor a tangential transcription error is the sort of fundamental flaw sufficient to overcome the presumption of regularity. *See Riggs Nat'l*, 295 F.3d at 21–22 (holding "clerical errors" do not overcome the presumption of regularity that attaches to a foreign government's tax receipt); *see also Porter v. Singletary*, 49 F.3d 1483, 1488 (11th Cir. 1995) (holding on habeas review that a "clerical error" "fell far short of overcoming the presumption of regularity" in a district court's criminal sentence).



Neither of the flaws Latif points to rebuts the presumption of regularity. At worst, they suggest the presence of minor transcription errors. But tangential "clerical errors" do not render a government document unreliable. *See Riggs Nat'l*, 295 F.3d at 21–22 (holding that "an inconsistency that merely calls into question the validity of an official document" does not rebut the presumption of regularity). It is almost inconceivable that a similar mistake could have resulted in the level of inculpatory detail contained in the rest of the Report. Consider Latif's reported admissions that (1) "'Alawi talked about jihad" with Latif, (2) "'Alawi took him to the Taliban," (3) the Taliban "gave him weapons training," (4) the Taliban "put him on the front line facing the Northern Alliance north of Kabul," and (5) "[h]e remained there, under

the command of Afghan leader Abu Fazl, until Taliban troops retreated and Kabul fell."[7] ███████████████ What series of innocent statements could possibly have been so badly corrupted, whether by misinterpretation or mistranscription? Latif does not suggest malapropism.

The dissent suggests an elaborate game of telephone between Latif, a translator, a note-taker, and a report-writer might have transmogrified hypothetical, innocent comments about a charity worker, an Islamic Center, an imam, and three religious teachers into the Report's inculpatory statements about a jihadi recruiter, a war-zone tour of duty, a Taliban commander, and three Taliban fighters. Dissenting Op. at 24–26. But as most children would tell you, any good game of telephone requires more than four participants to produce a result dramatically different from the starting phrase. The dissent also fails to account for Latif's incriminating statements about being escorted to the Taliban and receiving weapons training, and does not explain why, if these inculpatory statements were produced by government agents filling gaps in their comprehension "with what [they] expected to hear," *id.* at 25, those agents would invent the counterintuitive claim that Latif "never fired a shot" during his time on the front lines with the Taliban. ██████████ ██████████ It may be possible that the Report's incriminating admissions were all recorded by mistake while more innocent details, like the name of Latif's mother, his hometown, and the route he traveled, were transcribed accurately. But the relevant question is whether that hypothesis is likely. *See Al-Adahi*, 613 F.3d at 1110.

---

[7] ██████████████████████████████████
██████████████████████████████

The quantum of incriminating detail in the Report could hardly be produced by good-faith mistake, and we will not infer bad-faith fabrication absent any evidence to that effect. The inconsistencies in the Report may suggest a document produced on the field by imperfect translators or transcribers, but they do not prove the Report's description of Latif's incriminating statements is fundamentally unreliable.

2

"[T]he reliability of evidence can be determined not only by looking at the evidence alone but, alternatively, by considering sufficient additional information permitting the factfinder to assess its reliability." *Bensayah v. Obama*, 610 F.3d 718, 725–26 (D.C. Cir. 2010). The only piece of extrinsic evidence the district court relied on does nothing to weaken the presumption of regularity. The district court found Latif was captured with medical records in his possession, based on a government document's statement to that effect. The record contains a medical benefits referral from Yemen's Ministry of Defense, a "medical report" from a Jordanian Hospital confirming that Latif was admitted in 1994 for a "head injury," and a report from Yemen's Ministry of Public Health recommending in 1999 that Latif pursue further treatment at his own expense. This evidence corroborates Latif's assertions about his medical condition— and incidentally corroborates the Report's description of his medical trip to Jordan—but it does nothing to undermine the reliability of the Report. The Government is tasked with proving Latif was part of the Taliban or otherwise detainable—not disproving Latif's asserted medical condition. There is no inconsistency between Latif's claim that Ibrahim promised him medical treatment and the Report's statement that Ibrahim recruited him for jihad. Both may be true. For example, Ibrahim could have promised Latif

the medical treatment he needed to induce him join the Taliban.

Such a recruiting tactic (or cover story) would fit the *modus operandi* of the man who recruited many of the detainees whose interrogation reports appear in the record. One man reported that he

> was recruited by Ibrahim [Balawi] to travel to [Afghanistan] to search for a wife and job. Ibrahim told him if he traveled to [Afghanistan] he would be able to find a bride and the Taliban would provide him with a house and income. Ibrahim also mentioned the jihad in [Afghanistan]. . .

IIR 6 034 0365 02; ███████████████ Another detainee "advised that the reasons for going to Afghanistan were to train to go to fight in Chechnya and, secondly, to immigrate to Afghanistan." IIR 6 034 0861 02. Yet another "said he was a young man with no future who was tricked by Abu Khalud ['true name Ibrahim Al-Balawi'], who told him he could make money and find a wife in [Afghanistan]." Petitioner's Ex. 2. Ibrahim appears to have frequently offered his recruits tangible benefits in exchange for fighting jihad, or at least equipped them with such cover stories. Latif's medical records and his professed desire for medical treatment are therefore consistent with the Report, not inconsistent. Crediting those records does nothing to rebut the Report's presumption of regularity.

Latif cites one other piece of extrinsic evidence to challenge the Report's reliability—the decision of the

███████████████████████████████████

█████████████████ Latif's conclusion does not follow from his
premise. ██████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████ The other extrinsic evidence in this case
supports, rather than undermines, the presumption of
regularity.

All of Latif's subsequent statements, including his latest
declaration denying much of the incriminating information
from his first interview, corroborate elements of the Report.
In interviews that took place during Latif's confinement at
Guantanamo, he confirmed several additional details of the
Report, though he ascribed an exclusively medical purpose to
his journey and disclaimed any involvement with the Taliban.
In 2002, for example, Latif confirmed that he was from
'Udayn, that his mother's name is Muna, and that he travelled
to Afghanistan via Sana'a, Karachi, and Quetta, as stated in
the Report. ISN 156 SIR (Mar. 6, 2002). Latif repeatedly
confirmed that his only prior trip out of Yemen was to Jordan
for medical treatment—a unique detail from his initial
interview that the Report gets generally right. *See id.*; ISN
156 FD-302 (Apr. 26, 2002). The Government's
documentation of the chain of custody for Latif's personal
possessions confirms he was captured with four thousand
Pakistani rupees in his pocket, as noted in the Report.[8]

Many characters from the Report's dramatis personæ
reappear in Latif's subsequent interrogations, sometimes
playing different parts in his narrative with changes to the

---

[8] According to Latif, 4000 rupees were worth about $60 at the
time. Tr. Classified Merits Hearing (June 8, 2010), at 5–6.

spelling of their names. For example, the mysterious Ibrahim appears as an itinerant charity worker, not a jihadi recruiter, but his role is familiar. In March 2002, more than a year after the initial interview on which the Report was based, Latif confirmed that Ibrahim met him in Yemen, convinced him to travel, reunited with him at a mosque in Kandahar, hosted him there in Ibrahim's family home for three days, and then took him to his next destination in Afghanistan—all details that also appear the Report.[9] But Latif said his time in Kabul was spent memorizing the Koran at the institute, not training for jihad. ISN 156 SIR (Mar. 6, 2002). In the same interview, Latif confirmed that he was guided over the border from Afghanistan into Pakistan by Taqi Ullah (not Taqi Allah as the name was rendered in the Report), *id.*, and he identified Abdul Fadel (not Abu Fazl) as the imam of the mosque in Kabul (not a Taliban commander). *Id.* Apparently these spelling differences are inconsequential.[10] In March and April 2002 interrogations, Latif identified Abu Bakr of the Arab Emirates, Awba (not Abu Hudayfa) of Kuwait, and Hafs (not Abu Hafs) of Saudi Arabia, among others, as three of the teachers who stayed with him at the study center in Kabul (not fellow Taliban fighters). Latif's many statements echoing

---

[9] The Report stated both that Ibrahim owned a taxi in Kandahar and that he took Latif to the Taliban, who trained him and stationed him north of Kabul. In March 2002, Latif said Ibrahim took him directly to Kabul in a taxi paid for by Ibrahim.

elements of the Government's evidence corroborate the reliability of the Report and, together with the Report's intrinsic indicia of reliability, support rather than rebut the presumption of regularity. As we shall see, the district court's ambivalent findings about Latif's current story do no better.

### III

The district court issued its decision in this case a week after we published our opinion in *Al-Adahi v. Obama*, 613 F.3d 1102 (D.C. Cir. 2010). We observed that "[o]ne of the oddest things" about that case was that "despite an extensive record and numerous factual disputes, the district court never made any findings about whether Al-Adahi was generally a credible witness or whether his particular explanations for his actions were worthy of belief." *Id.* at 1110. The district court's analysis in this case suffers from the same omission. Because the court relied in part on Latif's declaration in discrediting the Report, *see Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 26 ("[T]he Court cannot credit [the Report] because . . . Latif has presented a plausible alternative story."), the district court was obligated to consider his credibility. Only a credible story could overcome the presumption of regularity to which the Report was entitled. The court's failure to make a credibility finding is especially puzzling where the inculpatory and exculpatory versions of the detainee's story overlap so that the factfinder is forced to untangle the detainee's current story from the shared framework of a prior narrative. Even doting Uncle Henry managed to evaluate Dorothy's credibility when she professed that the family and friends gathered around her bed had been with her in Oz. *See* THE WIZARD OF OZ (MGM 1939) ("Of course we believe you, Dorothy."). The district court, by contrast, mustered only a guarded finding of

plausibility. *See Latif,* 2010 U.S. Dist. LEXIS 83596, slip op. at 26.

Latif makes two main arguments in defense of the district court's decision to proceed without an explicit finding of credibility. First, he argues that the court did in fact believe his declaration even though its opinion did not use those words. Second, he argues no credibility determination is necessary because the district court relied on the inherent weakness of the Government's evidence to discredit it. Neither argument has merit.

### A

The closest the district court's opinion comes to making a credibility determination is in its statements that Latif's story was "plausible" and "not incredible." *Id.,* slip op. at 26-27. A story may be "plausible" or "not incredible" and yet be very unlikely. *Cf. Uthman v. Obama,* 637 F.3d 400, 406 (D.C. Cir. 2011) ("Uthman's account . . . involves many coincidences that are perhaps possible, but not likely."). A judgment about credibility, by contrast, measures the truthfulness of the speaker or the likelihood that what he says is true. *See* RICHARD HOOKER, THE LAWS OF ECCLESIASTICAL POLITY bk. II, ch. 4, at 151–52 (George Edelen ed., Harvard Univ. Press 1977) (1594) ("[T]hings are made credible, eyther by the knowne condition and qualitie of the utterer, or by the manifest likelihood of truth which they have in themselves."). Thus, neither of the district court's statements is equivalent to a finding that Latif's declaration is more likely true than false. On this, we are all agreed. *See* Dissenting Op. at 30.

By definition, a "plausible" statement is one "*seeming* reasonable, probable, or truthful"; it may in reality have only "a false appearance of reason or veracity." OXFORD ENGLISH

DICTIONARY ONLINE, http://www.oed.com/view/Entry/ 145466 (definition 4.a) (emphasis added) (last visited June 16, 2011). A plausible explanation does not necessarily compel credence. *See Zamanov v. Holder*, No. 08-72340, — F.3d —, 2011 U.S. App. LEXIS 8886, at *12 (9th Cir. Apr. 29, 2011) ("[Petitioner's] explanation ... is plausible. However, the record does not compel the finding that the [Immigration Judge's] unwillingness to believe this explanation ... was erroneous."). It is when a detainee tells a plausible story that an evaluation of his credibility is most needed. There may be several plausible explanations for Latif's itinerary; it is the district court's job to decide whether the Government's explanation is more likely than not. *See Al-Adahi*, 613 F.3d at 1110 ("Valid empirical proof requires not merely the establishment of possibility, but an estimate of probability." (quoting DAVID HACKETT FISCHER, HISTORIANS' FALLACIES: TOWARD A LOGIC OF HISTORICAL THOUGHT 53 (1970))).

Likewise, to say Latif's tale is "not incredible" is not to imply its teller ought to be believed. At best, the district court's statement means a reasonable finder of fact *could* believe Latif's story, not that he has actually done so. *Cf. United States v. Wooden*, 420 F.2d 251, 253 (D.C. Cir. 1969) ("The appellant's story was not incredible; indeed, the jury seems to have accepted it, at least in part. . . ."). Different factfinders may come to different conclusions about whether to credit evidence that is "not incredible" as a matter of law.

Other statements in the district court's opinion confirm that it did not reach a decision on Latif's credibility. For example, the court rejected the Government's "contention that Latif *must* be lying," *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 27 (emphasis added), while assiduously avoiding any determination that Latif was *not* lying. The court speculated

~~SECRET~~ 34 ~~SECRET~~

more than once that the inconsistencies in his statements "*may* be the result of a misstatement or a mistranslation," without ever making a finding to that effect. *Id.*, slip op. at 27 (emphasis added); *id.* ("The smaller inconsistencies . . . *may be* no more than misstatements or mistranslations." (emphasis added)). Likewise, the court found that "Latif did have an injury . . . for which he *might* therefore have sought treatment." *Id.*, slip op. at 28 (emphasis added); *see also id.*, slip op. at 6 n.4 (citing Latif's "alternative explanation for not having his passport at the time he was seized," without deciding whether that explanation is more likely than the Government's incriminating explanation). The district court provided no indication that it actually believed Latif's story and instead noted the story's "inconsistencies and unanswered questions." *Id.*, slip op. at 27.

B

The district court's decision gives us no reason to believe it would have reached the same result had it not relied on Latif's "plausible" version of the relevant events. The court said it could not "credit" the Report's inculpatory statements, partly "because . . . Latif has presented a plausible alternative story to explain his travel." *Id.*, slip op. at 26. Instead of advancing from plausibility to a judgment about Latif's veracity, the court repeated its plausibility finding: "Latif asserts that he did not make the statements, and his suggestion that mistranslation or misattribution likely explain the indication that he did is plausible." *Id.* The district court clearly relied on Latif's alternate account of his trip as one basis for rejecting the Report.

True, the court cited problems with the Report itself, including its substantial redactions, █████████ its reference to Latif's "hand"

SECRET 35 SECRET

instead of his head injury, ███████████ ████████████████████████ and the perceived lack of corroboration. But the Report was not so inherently unreliable that it could be discarded in the absence of countervailing evidence offering a more likely explanation for Latif's travels. *See supra* pp. 20-31. And Latif offers no evidence to rebut the Government's presumptively reliable record aside from his own statements and the Report itself. A merely "plausible" explanation cannot rebut the presumption of regularity. *See Riggs Nat'l*, 295 F.3d at 21. The other two grounds for the court's decision—minor transcription errors in the Report and a lack of corroboration for its incriminating statements—do not satisfy that standard. As we have already discussed, *see supra* pp. 21-27, the mistakes in the Report provide no support for the much more extensive fabrication Latif alleges. And to the extent the district court relied on a lack of corroborative evidence to discredit the Report, it highlighted its failure to afford the document a presumption of regularity. By definition, a presumptively reliable record needs no additional corroboration unless the presumption is rebutted.[11] Because the district court only found Latif's story

---

[11] Because he thinks the presumption of regularity should not apply to the Report, our dissenting colleague gives considerable weight to the Government's lack of "*independent* corroboration for any of the Report's incriminating facts." Dissenting Op. at 23 (emphasis added). But even without any presumption in favor of the Government's evidence, "we have not previously regarded corroboration as a requirement of a meaningful habeas proceeding." *Al Alwi*, 2011 U.S. App. LEXIS 14991, at *18. In *Al Alwi*, as in other cases, we "upheld a detainee's detention based on evidence that consisted almost entirely of the detainee's own testimony." *Id.* (quoting *Al-Madhwani*, 2011 U.S. App. LEXIS 10893, at *3) (citing *Al-Bihani*, 590 F.3d at 870). We said a lack of corroboration, though not necessarily decisive, should be taken "into account in assessing the reliability of the petitioner's out-of-

"plausible," not credible, the court merely established the possibility, not the probability, that Latif's story was true. And without a "comparative judgment about the evidence," there is no finding of fact for this court to review. *Al-Adahi*, 613 F.3d at 1110.

By forgoing a determination of credibility for one of plausibility, the district court replaced the necessary factual finding with a legal conclusion that some other reasonable factfinder might believe Latif's story. In other words, the district court took on the role of a reviewing court, assuming in effect that Latif already had been found credible and then applying a deferential standard of review to that imaginary finding. *Cf. Awad*, 608 F.3d at 7 ("[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it."). We cannot allow the district court to bypass its factfinding role in favor of an appellate standard of review. *Cf. Anderson v. United States*, 632 F.3d 1264, 1269–70 (D.C. Cir. 2011) (noting that the district court may not apply the appellate court's standard of review in crafting its own sentence). And since "*de novo* factfinding is inconsistent with [an appellate court's] proper role," *United States v. Brockenborrugh*, 575 F.3d 726, 746 (D.C. Cir. 2009), we are at an impasse.

---

court statements." *Id.* This principle is of no moment here, because Latif's sole challenge is to the accuracy of a presumptively reliable government document. Incidentally, it is not quite true that Latif's own statements are the only corroboration for the Report. ███████

███████████████████████████████████████████████████████████

> In sum, the district court's failure to resolve the key question of [the lead witness's] credibility makes it impossible for us to perform our appellate function. "The purpose of an appeal is to review the judgment of the district court, a function we cannot properly perform when we are left to guess at what it is we are reviewing." We therefore vacate the district court's order and remand for further proceedings consistent with this opinion.

*United States v. Holmes*, 387 F.3d 903, 907–08 (D.C. Cir. 2004) (quoting *United States v. Williams*, 951 F.2d 1287, 1290 (D.C. Cir. 1991)).

### C

On remand, the district court may consider any relevant, admissible evidence to aid its evaluation of Latif's credibility. If Latif again declines an opportunity to testify, that is another fact bearing on his credibility. Although the district court's factual findings may be supported by documentary evidence no less than by oral testimony, *see Barhoumi*, 609 F.3d at 423–24, a civil party's decision not to testify may support an adverse inference about his credibility, *see Mitchell v. United States*, 526 U.S. 314, 328 (1999) ("The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence against them."). Latif argues "it would make no sense to require an adverse inference in habeas cases in which the petitioner declines to testify while prohibiting such inferences in criminal cases." Appellee's Br. 52. This neglects the crucial point that the rule for criminal cases is based on the Fifth Amendment privilege against self-incrimination. *See Mitchell*, 526 U.S. at 316. That privilege has no application outside the criminal context, and a Guantanamo habeas

petitioner is not entitled to the same constitutional safeguards as a criminal defendant. *Cf. Al-Bihani*, 590 F.3d at 879 ("[T]he Confrontation Clause applies only in criminal prosecutions and is not directly relevant to the habeas setting."). Especially where a detainee's own self-serving statements comprise the only evidence against the Government's case, his refusal to testify is relevant to the district court's credibility determination.[12]

## IV

"[A] court considering a Guantanamo detainee's habeas petition must view the evidence collectively rather than in isolation." *Salahi v. Obama*, 625 F.3d 745, 753 (D.C. Cir. 2010). A habeas court's failure to do so is a legal error that we review *de novo*, separate and apart from the question of whether the resulting findings of fact are clearly erroneous in themselves. *See Al-Adahi*, 613 F.3d at 1111 ("[T]he district court clearly erred in its treatment of the evidence and in its view of the law. The court's conclusion was simply not a permissible view of the evidence. And it reached this conclusion through a series of legal errors."). Under *Al-Adahi*, a detainee is not entitled to habeas just because no single piece of evidence is sufficient by itself to justify his detention. 613 F.3d at 1105–06. It follows that a habeas court may not ignore relevant evidence, for a court cannot view collectively evidence that it has not even considered.

---

[12] On appeal, Latif retorts that the Government did not put on any witnesses either. Appellee's Br. 51. This misses the point. The drafter of the Report had no incentive to misrepresent Latif's statements upon capture, as the Report was not prepared with litigation in mind. Latif, by contrast, has every incentive to lie about the purpose of his visit. His failure to testify and subject himself to cross examination therefore undermines his credibility.

SECRET 39 SECRET

Perhaps because it had already denied the Government's key evidence a presumption of regularity, the district court committed both errors, explaining away some of the individual contradictions and coincidences in Latif's story one by one, as if each stood alone, and ignoring other probative details altogether. In *Al-Adahi*, we reversed the district court's grant of habeas because the court had failed to consider all the evidence in context. Viewing the evidence as a whole, we concluded the Government had proven the detainee "was more likely than not part of al-Qaida." *Id.* at 1111. Although we do not reach an ultimate conclusion on the merits in this case, the district court's similar treatment of the evidence in this case provides an alternative basis for remand.

The district court's unduly atomized approach is illustrated by its isolated treatment (or failure to consider) several potentially incriminating inferences that arise from evidence Latif himself offers in support of his petition— namely, (a) striking similarities between Latif's exculpatory story and the Report, (b) the route Latif admits traveling, and (c) contradictions in Latif's exculpatory statements. In addition, the district court improperly declined to consider ███████

███████████████████ We leave to the district court on remand the unfinished task of weighing this evidence in the aggregate.

A

What makes Latif's current story so hard to swallow is not its intrinsic implausibility but its correspondence in so many respects with the Report he now repudiates. Like Dorothy Gale upon awakening at home in Kansas after her fantastic journey to the Land of Oz, Latif's current account of

what transpired bears a striking resemblance to the familiar faces of his former narrative. *See* THE WIZARD OF OZ (MGM 1939). Just as the Gales' farmhands were transformed by Dorothy's imagination into the Scarecrow, Tin Man, and Cowardly Lion, it is at least plausible that Latif, when his liberty was at stake, transformed his jihadi recruiter into a charity worker, his Taliban commander into an imam, his comrades-in-arms into roommates, and his military training camp into a center for religious study. Although the court noted Latif's "innocent explanations for the names that appear in the [Report]," *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 15, and addressed them one by one, the court failed to consider the cumulative effect of all these uncanny coincidences as our precedent requires. *See Uthman*, 637 F.3d at 407 (concluding a detainee's account that "piles coincidence upon coincidence upon coincidence ... strains credulity"). Really, how likely is it that Latif's charity worker and imam just happened to have names virtually identical to those of a known Taliban recruiter and commander?

In discrediting the Report, the district court cited Latif's "plausible" suggestion that the incriminating statements in the Report are the result of misattribution.[13] *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 26. But Latif's own insistence (or self-serving *volte-face*) is his only evidence that the

---

[13] Throughout the military and judicial proceedings to determine whether he is properly detained, Latif's defense has been that the statements in the Report were misattributed to him. Before the Combatant Status Review Tribunal, Latif said, "I told you I wasn't the person they were referring to. I never went to the places that you said I did. I am not the person this case is based on." Ex. 30 (ISN 156 CSRT Tr.), at 3. Before the district court, Latif "argued that the statements in the ▮▮▮ Report were likely a product of mistranslation, misattribution, or some other mistake." Appellee's Br. 9.

incriminating statements are inaccurate. ███████████

███████████████████████████

Those incriminating admissions are intertwined with other details in the Report that persist in Latif's current account of his travels. The district court makes no effort to untangle that knot.

### B

Nor did the district court consider that Latif's admitted route to Afghanistan from his home in Yemen corroborates the evidence that Latif trained with the Taliban. We have held that "traveling to Afghanistan along a distinctive path used by al Qaeda members can be probative evidence that the traveler was part of al Qaeda." *Uthman*, 637 F.3d at 405 (citing *Al Odah*, 611 F.3d at 16). At Guantanamo, more than a year after his capture, Latif told his interrogators he flew from Sana'a, Yemen to Karachi, Pakistan in early 2001 with a plane ticket Ibrahim gave him. From there he took a bus to Quetta, Pakistan and a taxi to Kandahar, Afghanistan as Ibrahim had instructed. Then Ibrahim took him by taxi to Kabul, where Latif said he spent five months in the religious study center.[14] This route has been well traveled by al-Qaida and Taliban recruits and by our precedent. *See Uthman*, 637 F.3d at 405 (noting that Uthman's route from Sana'a to Karachi by plane, from Karachi to Quetta by bus,

---

[14] Although Latif's more recent declaration in the district court leaves out some of these details, he does not deny taking this route. Indeed, Latif cites the consistency of his Guantanamo interrogations as evidence that his current story is true. Appellee's Br. 18-22. Latif's recent declaration confirms he took a bus to Quetta and a taxi from Quetta to Afghanistan, and then stayed in Kabul before returning to Pakistan.

~~SECRET~~                42        ~~SECRET~~

from Quetta to a Taliban office by taxi, and from there to Kandahar "is similar to the paths of admitted al Qaeda members"); *Al Odah*, 611 F.3d at 10, 12 (noting that a similar "route used by al Odah was a common travel route for those going to Afghanistan to join the Taliban"). The record in this case is replete with interrogation summaries of other Yemeni detainees who followed the same route to Afghanistan. Instead of focusing on Latif's route, the district court observed that "[n]o other detainee told interrogators that he fled from Afghanistan to Pakistan, from Tora Bora or any other location, with Latif." *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 26. That is true. But the court overlooked the implications of Latif's own subsequent admissions about the route he traveled.[15] This is relevant evidence, and it should have factored into the district court's decision. The court's failure even to consider it is a legal error that compels remand.

C

Latif's current version of his story conflicts in significant ways with other things he is reported to have told interrogators at Guantanamo. The district court rejected the Report "having taken into consideration the explanation of events Latif has offered" and even noted some of the "inconsistencies and unanswered questions" in Latif's story. *Id.*, slip op. at 27. This is a welcome step toward the holistic approach to the evidence we called for in *Al-Adahi*. But as with the other evidence, the district court examined some

---

[15] The district court did not, as the dissent suggests, "treat[] [this] evidence as more akin to traveling along I-95 than a lonely country road." Dissenting Op. at 35. The court did not consider it at all.

~~SECRET~~ 43 ~~SECRET~~

contradictions in isolation from the rest of the evidence and overlooked others altogether.

The court gestured obliquely to what it characterized as "smaller inconsistencies" that it concluded "may be no more than misstatements or mistranslations." *Id.* Apparently, the court found it unnecessary to get to the bottom of these contradictions because "even if some details of Latif's story have changed over time, for whatever reason, its fundamentals have remained the same." *Id.* (The district court did not apply similar reasoning to the Government's evidence. The Report contains two minor discrepancies but its fundamentals have been corroborated time and again.) Applied to Latif's contradictory statements, the district court's reasoning neglects "the well-settled principle that false exculpatory statements are evidence—often strong evidence—of guilt." *Al-Adahi*, 613 F.3d at 1107. Thus, even if a given inconsistency in a detainee's story does not go to the central question of his involvement with the Taliban or al-Qaida, it may be relevant nonetheless to the court's evaluation of his credibility, which in turn bears on the reliability of the Government's evidence. *Cf. United States v. Philatelic Leasing, Ltd.*, 601 F. Supp. 1554, 1565 (S.D.N.Y. 1985) (citing the principle, "which Wigmore has described as 'one of the simplest in human experience,'" that "when a litigating party resorts to 'falsehoods or other fraud' in trying to establish a position, the court may conclude the position to be without merit and that the relevant facts are contrary to those asserted by the party") (quoting 2 John Henry Wigmore, Evidence § 278, at 133 (1979)).

Many of these "smaller inconsistencies" shore up details in the Report in ways the district court overlooked. The court observed, for example, that in Latif's 2009 declaration (in which he claimed to be too disabled to fight) Latif said he

"spent three months at the Islamic Jordanian Hospital in Amman, Jordan," Petitioner's Decl., ¶ 3, but his own medical records reveal that he was released just five days after admission. The court made no explicit finding about the source of this inconsistency, and it failed to mention that Latif himself testified before the Combatant Status Review Tribunal that he was "treated ... for five days," ISN 156 CSRT Tr. at 8, a fact that is surely relevant to the credibility of Latif's recent declaration.

Although Latif now says he is married and has a son, Petitioner's Decl., ¶1, the Report indicates Latif is unmarried and has no children. ████████████ The court noted this inconsistency, *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 15, but only to cast doubt on the accuracy of the Report. (Since Latif has offered no evidence aside from his own statements to prove his marital status, it is not clear how the district court resolved this conflict in his favor, absent a credibility determination.) The court failed to consider that Latif's current declaration also conflicts with his Guantanamo intake form, which indicates he is divorced, and with his statement to an interrogator in June 2003 that he "would like to get married and have some children." ISN 156 MFR (June 4, 2003). Both of these statements corroborate the Report and cast doubt on Latif's recent declaration.

The court failed even to mention other incongruities among the stories Latif has told his interrogators. Latif has said that he stayed with a doctor in Kabul, but also that he stayed in a religious study center there; that Latif was arrested at the Pakistani border fleeing Afghanistan, but also that he was arrested at a hospital in Pakistan; that he paid for his medical treatment, but also that he could not pay; that Ibrahim's charitable organization is called Jamiat an-Nur, but also that is call Gameiat al Hekma or, alternatively, Jam-eiah

~~SECRET~~
45
~~SECRET~~

Islam. Even if some of the inconsistencies in Latif's story "may be," as the district court suggested about others, "no more than misstatements or mistranslations," *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 27, viewed together with the rest of the evidence they undermine the credibility of Latif's declaration. "We do not say that any of these particular pieces of evidence are conclusive, but we do say that they add to the weight of the government's case against [the detainee] and that the district court clearly erred in tossing them aside." *Al-Adahi*, 613 F.3d at 1110.

D



~~SECRET~~ 46 ~~SECRET~~



[16] We do not *"find[]"* that this evidence "do[es]" in fact implicate" Latif, as the dissent accuses us of doing. Dissenting Op. at 2. Rather, we hold the district court's findings suspect in that the court "failed to take into account" related evidence when it made those findings. *Al-Adahi*, 613 F.3d at 1108.

E

In a recent case, we held "the location and date of [the detainee's] capture, together with the company he was keeping, strongly suggest that he was part of al Qaeda." *Uthman*, 637 F.3d at 405. The Yemeni detainee in that case was captured in December 2001 with at least five other Yemeni men, two of whom were confessed al-Qaida members, at the Afghan-Pakistani border near Tora Bora, a cave complex in Eastern Afghanistan that was, at that time, the site of a battle between al-Qaida and the United States. *Id.* Analogous details in the circumstances of Latif's capture should have been weighed in combination with the rest of the Government's incriminating evidence.

Latif admits that he was captured in "late 2001" after being led across the Afghan border into Pakistan, Appellee's Br. 7, and he confirmed to his Guantanamo interrogators that an Afghan guide led him across the border. The record contains no direct evidence about Latif's route from Kabul to the Pakistani border. The district court noted that around that time, "after the Taliban was defeated in the battle" north of Kabul, "many fighters went to Jalalabad, Afghanistan, moved on to the Tora Bora mountain area, ... and followed guides across the border into Pakistan." *Latif*, 2010 U.S. Dist. LEXIS 83596, slip op. at 12. But the district court concluded "the timing of [Latif's] departure from Kabul is *not sufficient* to create an inference that he was involved in fighting." *Id.*, slip op. at 27 (emphasis added). This is exactly the formulation we criticized in *Al-Adahi*. In that case the district court concluded "Al-Adahi's attendance at an al-Qaida training camp 'is *not sufficient* to carry the Government's burden of showing that he was a part' of al-Qaida." 613 F.3d at 1105 (emphasis added). We cited that statement as an example of the court's

~~SECRET~~ 48 ~~SECRET~~

having "wrongly 'required each piece of the government's evidence to bear weight without regard to all (or indeed any) other evidence in the case." *Id.* at 1105–06. The district court commits exactly the same "fundamental mistake" in this case by considering the time and place of Latif's capture in isolation from the rest of the evidence. *Id.* at 1106. The question to ask is not whether the circumstances of Latif's capture are sufficient by themselves to prove he was part of the Taliban, but whether, in combination with the rest of the evidence, they make that conclusion more likely than not.





███████████████████████████████

The dissent admits the circumstances of Latif's flight from Afghanistan are helpful to the Government's case, but contends they may not be *very* helpful since, for all we know, his route was frequented by non-combatants too. Dissenting Op. at 33–35. This bold speculation is beyond our purview as an appellate court, and the district court did not suggest it had so much as considered the possibility. (Indeed, the record contains no evidence to support the dissent's theory.) At this juncture, all we can say is that the location and timing of Latif's exodus is relevant evidence, and the district court erred by considering his route in isolation and ignoring the similarly situated detainees' altogether.

F

To summarize, in addition to viewing Latif's own statements in isolation, the district court ignored the probative value of (1) Latif's familiar, four-leg route to Kabul; (2) Latif's CSRT testimony that he was hospitalized for just five days instead of three months as he now claims; (3) Latif's statements at Guantanamo that he is divorced and would like to get married, which corroborate the Report and conflict with his current story; ███████████████ and a host of other inconsistencies. One cannot gather from a fair reading of the district court's opinion that any of these facts informed its conclusion about the Government's evidence. In light of our application of the presumption of regularity, there can be no question on remand

SECRET 50 SECRET

but that all of this evidence must be considered—and considered as a whole.

The dissent makes much of the fact that, contrary to the usual practice, we do not assume the court considered all the evidence it failed to mention. Dissenting Op. at 43-44. If that is true, the result flows from the unusual posture of this case. Even in the typical he-said/she-said case–in which two people provide conflicting statements–the court must conduct a close and precise balancing of the evidence to reach a valid result. In detainee cases the difficulties are heightened because it is a he-said/he-said case—the same person provides both the incriminating and exculpatory statements. Thus the *Al Adahi* formulation becomes critical.

The district court's failure to address certain relevant evidence leaves us with no confidence in its conclusions about the evidence it did consider. For example, the district court implicitly rejected evidence that Latif's purported benefactor, Ibrahim Al-Alawi, is actually Ibrahim Ba'alawi, known as Abu Khalud, an al-Qaida facilitator. Other detainees have described Ibrahim Ba'alawi in much the same role Ibrahim Al-Alawi plays in the Report. Several detainees reported meeting Ibrahim Ba'alawi in Taiz, Yemen, near Ibb, which the Report describes as Ibrahim Al-Alawi's hometown, and being recruited by him to fight jihad. They report that Ba'alawi arranged their travel along the same route Latif took to Afghanistan, lived in Kandahar as Latif's benefactor did, and arranged for their attendance at military training camps. Although noting the similarities between Ibrahim Ba'alawi and the Ibrahim Al-Alawi who appears in Latif's current story and the Report, the district court implicitly concluded they were different men on the basis of exculpatory statements Latif made *after* his initial interview. Latif makes much of the fact that Al-Alawi is a different name from

~~SECRET~~                                        ~~SECRET~~

Ba'alawi, not just a variant spelling, and at least seven detainees reported their recruiter's name as Ba'alawi or some variant thereof. But such a minor phonetic mistake could easily result from a translation or transcription error.[18] It does not negate altogether the probative value of this link between Latif's current story and a known recruiter whose *modus operandi* matches up so closely with the Report's account of Latif's recruiter. The district court implied Latif's benefactor was a different person from the known jihadi recruiter, without ever finding that to be so.

Even if the district court had made a clear finding in Latif's favor about Ibrahim's identity, we could not affirm it on this record. Since the probability of one asserted fact is conditioned upon the likelihood that related facts are true, we cannot uphold the district court's evaluation of a particular piece of evidence that is susceptible to more than one interpretation when the court has ignored related evidence.

On remand, the district court has an opportunity to evaluate all the evidence as a whole. In the event of another appeal following that evaluation, we would have to decide whether, in light of all the evidence, we are left with "the definite and firm conviction that a mistake has been committed." *Almerfedi*, — F.3d —, 2011 U.S. App. LEXIS

---

[18] Indeed, as the district court acknowledged, the recruiter is identified as Alawi in another detainee's interrogation report. The district court dismissed this evidence, observing that in another case, the district court had discredited this detainee's statement about an unrelated detail—the timing of another detainee's arrival at a guesthouse—because it conflicted with other detainees' statements. *Latif*, 2010 U.S. Dist. LEXIS 83596, at *26 n.10, slip op. at 19 n.10 (citing *Abdah v. Obama*, 717 F. Supp. 2d 21, 35 (D.D.C. 2010)).

~~SECRET~~                    52                    ~~SECRET~~

11696, at *23. In its current posture, this case does not require us to answer that difficult question.[19]

V

Although the district court committed the same errors here as in *Al-Adahi*, the evidence before us presents a closer question than we faced in that case and our subsequent reversals. *Cf. Almerfedi*, — F.3d —, 2011 U.S. App. LEXIS 11696; *Uthman*, 637 F.3d at 400. And the Government says it has discovered new evidence pertaining to the origins of the Report that neither the district court nor our court has had occasion to consider.

As the dissenters warned and as the amount of ink spilled in this single case attests, *Boumediene*'s airy suppositions have caused great difficulty for the Executive and the courts. *See* 553 U.S. at 824-26 (Roberts, C.J., dissenting); *id.* at 827-28 (Scalia, J., dissenting). Luckily, this is a shrinking category of cases. The ranks of Guantanamo detainees will not be replenished. *Boumediene* fundamentally altered the calculus of war, guaranteeing that the benefit of intelligence that might be gained–even from high-value detainees–is outweighed by the systemic cost of defending detention decisions. *Id.* at 828 (Scalia, J., dissenting). While the court in *Boumediene*

---

[19] Judge Henderson would reverse the district court's grant of habeas corpus outright. In her view, "remand is unnecessary because 'the record permits only one resolution of the factual issue.'" Concurring Op. at 12 (quoting *Pullman-Standard v. United Steel Workers of Am., AFL-CIO*, 456 U.S. 273, 292 (1982)). Because of the legal errors we have both identified, I find it unnecessary to decide that question. Remand is warranted not only when "further fact-finding by the district court is necessary," but also when it "would be helpful." *Al Alwi*, 2011 U.S. App. LEXIS 14991, at *9. This is such a case.

~~SECRET~~ 53 ~~SECRET~~

expressed sensitivity to such concerns, it did not find them "dispositive." *Id.* at 769. *Boumediene*'s logic is compelling: take no prisoners. Point taken.

In light of the district court's expertise as a fact finder and judge of credibility, I am reluctant to reach the merits before the district court has had an opportunity to apply the controlling precedent. *But see* Concurring Op. at 12 ("[F]urther factfinding will be a waste of time and judicial resources."). We therefore vacate and remand the district court's grant of habeas for further proceedings. On remand the district court must consider the evidence as a whole, bearing in mind that even details insufficiently probative by themselves may tip the balance of probability, that false exculpatory statements may be evidence of guilt, and that in the absence of other clear evidence a detainee's self-serving account must be credible—not just plausible—to overcome presumptively reliable government evidence.

*So ordered.*

~~SECRET~~

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

Although I agree with Judge Brown's analysis and therefore concur in the judgment of remand, I write separately to respond to the dissent and to explain that, in my view, the better course would be to simply reverse the district court's grant of habeas corpus relief to the detainee Adnan Farhan Abd Al Latif. The dissent attacks Judge Brown's majority opinion on three grounds. The first two grounds are related: the dissent claims that there is no clear error in the district court's opinion, Dissenting Op. at 2, 20–45 and that we have arrived at the contrary conclusion—finding clear error—only by "undertak[ing] a wholesale revision of the district court's careful fact findings," and "suggest[ing] [our] own story," Dissenting Op. at 2, 32; *see id.* at 32–39. As discussed below, however, the dissent misunderstands the clear error standard of review and its application to this case. The dissent also claims that our use of the presumption of regularity "moves the goal posts" and "calls the game in the government's favor." Dissenting Op. at 2, 19. As also set forth below, however, the dissent's high-pitched rhetoric not only ignores the safeguards under which we have already endorsed—albeit not explicitly—the presumption of regularity but also fails to understand how the presumption of regularity in fact aids the reliability inquiry of hearsay evidence. Finally, I believe remand for further factfinding will be a pointless exercise. Assuming he decides to testify, Latif cannot persuasively counter the presumption of regularity. Nor can he overcome the long odds against his exculpatory narrative by testifying, as his declaration already tells his story and any embroidery thereof will only work against him. Accordingly, I concur in the remand judgment only.

~~SECRET~~ 2 ~~SECRET~~

## I.

This appeal hinges on one question: did the district court correctly find the government's key piece of evidence unreliable? *See Abdah v. Obama (Latif)*, No. 04-1254, 2010 WL 3270761, at \*9, slip op. at 25 (D.D.C. July 21, 2010). "The question whether evidence is sufficiently reliable to credit is one we review for clear error," *Al Alwi v. Obama*, --- F.3d ----, 2011 WL 2937134, at \*6 (D.C. Cir. July 22, 2011), and ordinarily this standard of review creates little controversy.

The clear error standard requires us to reverse a factual finding if " 'on the entire evidence' " we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The dissent first claims that we cannot legitimately find clear error here, relying on our precedent that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010) (internal quotations omitted), *cert. denied*, 131 S. Ct. 1814 (2011), and that "[t]he task of resolving discrepancies among the various accounts offered into evidence is quintessentially a matter . . . for the district court sitting as the fact-finder," *Al-Madhwani v. Obama*, 642 F.3d 1071, 1076 (D.C. Cir. 2011) (internal quotations omitted). *See* Dissenting Op. at 20, 31. But the dissent apparently forgets that the quoted passages describe only the starting point for clear error review. Granted, the district court has wide latitude to resolve factual disputes—but only within certain bounds. We must assure ourselves that the district court's finding is "permissible" or "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 574. In both *Awad* and *Al-Madhwani*, we examined the evidentiary bases for the district court's factual findings and, finding them

within the range of "permissible" inferences to be drawn from the evidence, concluded that the district court had not clearly erred. *See Awad*, 608 F.3d at 6–9; *Al-Madhwani*, 642 F.3d at 1076. But in both *Awad* and *Al-Madhwani*, unlike here, the district court's permissible inferences were based on the record in its entirety—not on the view that one side's evidence, standing in isolation, is plausible.

The dissent seems to suggest that if Latif's story "on its own terms[] is not 'intrinsic[ally] implausible,' " then we cannot review the district court's evaluation of the government's key piece of evidence or other pieces of evidence. Dissenting Op. at 30, 32. It is not enough, however, for the district court to base its factual findings on *some* evidence in the record. The clear error standard authorizes us to reverse a finding, not unless, but " '*although* there is evidence to support it.' " *Anderson*, 470 U.S. at 573 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395) (emphasis added); *see also Easley v. Cromartie*, 532 U.S. 234, 257 (2001) (finding clear error even where "record contains a modicum of evidence offering support for the District Court's conclusion"). Where the record contains conflicting evidence, then, the clear error standard requires us, as the reviewing court, to assess the comparative weight of the evidence both for and against the district court's finding. It may be that the evidence relied upon by the district court is insufficiently probative to sustain its finding. *See, e.g., Easley*, 532 U.S. at 247, 250, 257 (clear error where statistical evidence "too small to carry significant evidentiary weight," testimony did not provide "more than minimal support" and other evidence did not "significantly strengthen" district court's finding). Or the evidence may be outweighed by other, more persuasive evidence. *See, e.g., Anderson*, 470 U.S. at 575 (credibility finding clearly erroneous if "[d]ocuments or objective evidence . . . contradict the witness' story"); *U.S. Gypsum Co.*, 333 U.S. at 396 (clear error

~~SECRET~~ 4 ~~SECRET~~

"[w]here . . . testimony is in conflict with contemporaneous documents"). The dissent is simply wrong to equate Judge Brown's careful and complete review of the record evidence—which finds Latif's version both minimally probative, Majority Op. at 45–46, and decisively outweighed by the government's evidence, *id.* at 20–31—with a "wholesale revision of the district court's careful fact findings," Dissenting Op. at 2.

With the clear error framework in mind, there is no difficulty in concluding that the district court clearly erred in failing to credit the █████████████████████ "Report") made in late December 2001 ████████████████████ after Latif was captured and before he was transferred to Guantanamo Bay. *See Latif,* slip op. at 6–7, 25. As Judge Brown demonstrates, the district court gave insufficient probative weight to the evidence supporting the reliability of the Report—including, in particular, the striking consistencies between the Report and Latif's subsequent admissions, *see* Majority Op. at 29–31[1]—and to the presumption of regularity that we accord a government record, *see* Majority Op. at 6–20. At the same time, the district court gave undue emphasis both to

---

[1] As Judge Brown explains, Latif subsequently made statements to interrogators at Guantanamo Bay that confirm assertions in the Report about his hometown, mother's name, route of travel into Afghanistan and his earlier journey to Jordan for medical treatment. Latif also told Guantanamo interrogators the names of several men he met in Afghanistan which names correspond to all of the names listed in the Report. In addition, the government's chain-of-custody document listing Latif's possessions states that Latif had four thousand Pakistani rupees when captured—confirming another detail in the Report.

largely immaterial errors in the Report and to Latif's "plausible" alternative explanation for his travels, *Latif*, 2010 WL 3270761, at *9, slip op. at 26. The second error is especially glaring not only in light of the district court's failure to make any finding regarding Latif's credibility, *see Al-Adahi v. Obama*, 613 F.3d 1102, 1110 (D.C. Cir. 2010) (by "sp[eaking] only of a possible alternative explanation" for detainee's actions and failing to "make any finding about whether this alternative was more likely than the government's explanation," district court failed to make any "comparative judgment about the evidence [that] is at the heart of the preponderance standard of proof" (internal quotations omitted)), *cert. denied*, 131 S. Ct. 1001 (2011), but also in light of the inconsistencies between Latif's alternative explanation—as set forth in his declaration submitted to the district court—and his earlier statements made to the Guantanamo interrogators, *see* Majority Op. at 42–45.[2] After "consider[ing] all of the evidence taken as a whole," *Awad*, 608 F.3d at 7, I, like Judge Brown, cannot help but conclude that the district court's finding regarding the unreliability of the Report coupled with its finding regarding the mere plausibility of

---

[2] Judge Brown cites a variety of examples—for instance, Latif's declaration states that he is married and has one son but he told interrogators that he "would like to get married and have some children"; Latif's declaration states that he planned to meet Ibrahim in Pakistan but he told interrogators that he planned to meet Ibrahim in Afghanistan. Latif has also made inconsistent statements about whether he stayed with a doctor in Kabul or at a religious institute in Kabul, whether Ibrahim was with Latif at the time he decided to flee Afghanistan or had already left several weeks earlier, whether Latif was arrested at the Pakistani border fleeing Afghanistan or arrested at a hospital in Pakistan, whether Latif paid for his medical treatment or not and whether Ibrahim's charitable organization was called Jamiat an-Nur, Gameiat al Hekma or Jam-eiah Islam.

Latif's story is neither "permissible" nor "plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 574.

## II.

The dissent also asserts that application of the presumption of regularity to the Report "disturbs" the "careful and conscious balance of the important interests at stake" we have struck in past detainee decisions for admitting and assessing the reliability of hearsay evidence. Dissenting Op. at 12. Judge Brown thoroughly disposes of the assertion—laying out in detail that, while we have not heretofore enunciated the presumption of regularity, we have all but done so. *See* Majority Op. at 14–20. And we most assuredly are not "discard[ing] the unanimous, hard-earned wisdom" of district courts that have assessed hearsay evidence in detainee cases. Dissenting Op. at 13. To the contrary, sound evidentiary considerations warrant incorporating the presumption of regularity—in the careful manner we expressly do today—into the district court's overall reliability assessment of these records as we routinely do with others, including the point that the facts supporting the presumption of regularity have significant probative force in their own right, as discussed below.

Moreover, our holding does nothing to disturb the existing framework for hearsay evidence. All hearsay evidence "must be accorded weight only in proportion to its reliability." *Barhoumi v. Obama*, 609 F.3d 416, 427 (D.C. Cir. 2010). The district court assesses reliability in the first instance, *see Parhat v. Gates*, 532 F.3d 834, 847–48 (D.C. Cir. 2008), and in so doing must consider whatever "indicia of reliability" the hearsay evidence manifests as well as any " 'additional information' " bearing on the question of reliability. *Bensayah v. Obama*, 610 F.3d 718,

SECRET 7 SECRET

725–26 (D.C. Cir. 2010) (quoting *Parhat*, 532 F.3d at 849).[3] The district court considers a wide range of factors—recognizing that any one of several "hearsay dangers" might render the hearsay unreliable, *see Williamson v. United States*, 512 U.S. 594, 598 (1994) ("The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener."). Information "relayed through an

---

[3] *Parhat* also requires that hearsay evidence "be presented in a form, or with sufficient additional information, that permits the . . . court to assess its reliability." 532 F.3d at 849. As *Barhoumi* notes, however, the quoted passage has more to do with the form than with the substance of hearsay evidence: "the problem with the intelligence reports at issue in *Parhat* was that they failed to provide 'any of the underlying reporting upon which the documents' bottom-line assertions are founded,' thus inhibiting our ability to evaluate the reliability of those assertions." 609 F.3d at 428 (quoting *Parhat*, 532 F.3d at 846–47)). Unlike the unsourced hearsay allegations in *Parhat*, the Report summarizes an interview with Latif himself and thus identifies "the underlying reporting upon which the government's assertions are founded," which is sufficient to enable the district court to assess its reliability and meet *Parhat*'s requirement. *Barhoumi*, 609 F.3d at 428 (internal quotations omitted). There is a slightly different nuance to the reliability inquiry here: unlike either *Parhat* or *Barhoumi*, one of the key disputes is the source of the hearsay statement—in other words, whether it can be reliably attributed to Latif—and not only the accuracy of the underlying narrative. But here, too, the Report itself constitutes evidence that Latif is the source of the inculpatory statements, corroborated by extrinsic evidence of Latif's biographical details, medical history and admissions to his Guantanamo interrogators. *See supra* n.2. Thus, the Report is "presented in a form" and "with sufficient additional information" to support the reliability of its attribution to Latif. *Parhat*, 532 F.3d at 849.

~~SECRET~~ 8 ~~SECRET~~

interrogator's account" presents an additional "level of technical hearsay because the interrogator is a third party unavailable for cross examination." *Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010), *cert. denied*, 131 S. Ct. 1814 (2011). The presumption of regularity does not come into play with respect to many aspects of hearsay, however; for example, it does not vouch for assertions made about a detainee by a third party nor does it answer the reliability inquiry if the detainee claims he was coerced in making admissions. Rather, the presumption touches on only one dimension of reliability: "it presumes the government official accurately identified the source and accurately summarized his statement, but it implies nothing about the truth of the underlying non-government source's statement." Majority Op. at 10. Thus it addresses only the question whether the "interrogator's account,"*Al-Bihani*, 590 F.3d at 879, faithfully records the underlying statement. *See, e.g., United States v. Smith*, 521 F.2d 957, 964–65 (D.C. Cir. 1975) ("it is presumed that [the police officer] accurately transcribed and reported [the witness's] story" but "complaining witness'[s] description of the crime, recorded by the police officer in his report, . . . does not deserve the presumption of regularity").

The Federal Rules of Evidence, which carve out exceptions to the general rule against hearsay on the ground that "some kinds of out-of-court statements are less subject to . . . hearsay dangers," *Williamson*, 512 U.S. at 598, make certain public records admissible, using "the assumption that a public official will perform his duty properly" as well as "the reliability factors underlying records of regularly conducted activities generally." Fed. R. Evid. 803(8) advisory committee's notes (1972 Proposed Rules). Granted, in detainee habeas cases, the Rules do not decide the admissibility of hearsay evidence. *Barhoumi*, 609 F.3d at 422 (rejecting as "counter to this court's [precedent]" the

~~SECRET~~ 9 ~~SECRET~~

claim of error in admission of hearsay evidence "absent a demonstration by the government that they fall within an established hearsay exception in the Federal Rules of Evidence"). But because the presumption of regularity is based on much the same rationale as the public records exception, *see United States v. Chem. Found.*, 272 U.S. 1, 15 (1926) (presumption applies because "courts presume that [public officers] have properly discharged their official duties."); *cf. Legille v. Dann*, 544 F.2d 1, 7 n.39 (D.C. Cir. 1976) (presumption of due delivery of the mail and presumption of regularity in government agency's handling thereof "have a common origin in regularity of action"), the facts supporting the presumption of regularity carry significant probative force in their own right.[4] *See Legille*, 544 F.2d at 9 ("The facts giving rise to the presumption [of procedural regularity] would also have evidentiary force, and as evidence would command the respect normally accorded proof of any fact."); *Webster v. Estelle*, 505 F.2d 926, 930 (5th Cir. 1974) ("The same special reliability that warrants relaxing the hearsay rule as to [public records] also warrants according them great evidentiary weight."), *cert. denied*, 421 U.S. 918 (1975); *Stone v. Stone*, 136 F.2d 761, 763 (D.C. Cir. 1943) ("[T]he basic fact that public officials usually do their duty . . . has . . . that quality and quantity of probative value to which it is entitled, entirely apart from any presumption; just as is true of any other fact which is based on common experience."); *Alsabri v. Obama*, 764 F.

---

[4]While the facts surrounding hearsay evidence may not always justify applying the presumption of regularity, it is properly applied here because the interview with Latif is recorded in a type of intelligence report ████████████████████████████████

Supp. 2d 60, 68 (D.D.C. 2011) ("The fact that [detainee interrogation reports] were prepared by government agents in the course of their normal intelligence gathering duties provides a degree of support for their reliability."). The presumption of regularity thus embodies a common-sense judgment about the general reliability of hearsay evidence memorialized in a government record. And the district court's failure to apply the presumption of regularity is an error going to the heart of the "careful and fine-grained approach to the assessment of reliability," Dissenting Op. at 13, it is required to undertake.

Nor does the requirement that a challenger offer "clear or specific evidence" to defeat the presumption of regularity, *Riggs Nat'l Corp. v. Comm'r*, 295 F.3d 16, 21 (D.C. Cir. 2002), somehow short-circuit the district court's reliability analysis, as the dissent suggests. Dissenting Op. at 9–10. It is well established that clear error can occur if a district court fails to credit otherwise reliable evidence on the basis of insignificant gaps therein. *See, e.g., Almerfedi v. Obama*, --- F.3d ----, 2011 WL 2277607, at *5 (D.C. Cir. June 10, 2011) ("district court clearly erred in regarding [hearsay evidence] as unreliable" because of "inconsequential" "discrepancy in dates"). Requiring a challenger to produce "clear or specific evidence"—that is, evidence with real probative force—to defeat the presumption of regularity prevents a district court from relying on minor discrepancies to reject a government record. At the same time, it discourages the kind of fly-specking in which the district court—and the dissent—seem to have engaged in this case. The dissent, for instance, focuses on a handful of "factual errors" identified by the district court in the Report. Dissenting Op. at 21–22 (citing Report's mistaken reference to "hand" injury, ambiguity about whether injury was Latif's or friend's, putative error about Latif's marital status ███████████████████

████████ The only noteworthy characteristic of these "factual errors" is how trivial all ████ are[5]—and therefore how little probative force they lend to the district court's theory of misattribution or mistranscription. Indeed, even in its garbled reference to Latif's medical history, the Report includes an undisputed detail—his 1994 trip to Jordan to receive medical treatment for a head injury, *see* Majority Op. at 27—that belies the idea that a reasonable factfinder could find ████████ ████████████████████ as the district court suggested. *Latif,* slip op. at 26. Nor could a reasonable factfinder plausibly interpret the flaws in the Report as adding up either to the quantum or to the quality of transcription error sufficient to transform Latif's exculpatory wrong-place-at-the-wrong-time account into the coherent and detailed narrative the Report presents. *See id.*



~~SECRET~~ 12 ~~SECRET~~

### III.

Based on the considerations outlined above—as well as Judge Brown's comprehensive opinion—I believe the district court clearly erred in failing to credit the Report. Unlike my colleague, however, I also believe remanding the case for further factfinding will be a waste of time and judicial resources. Judge Brown believes remand—with the possibility that Latif might choose to testify—is necessary to allow the district court to correctly weigh Latif's credibility. *See* Majority Op. at 36–38. While I agree that the district court erred in failing to assess Latif's credibility, Majority Op. at 31–38—for "[a]t no point did the court make any finding about whether [Latif's narrative] was more likely than the government's explanation," *Al-Adahi v. Obama*, 613 F.3d at 1110—I also believe remand is unnecessary because "the record permits only one resolution of the factual issue," *Pullman-Standard v. United Steel Workers of Am., AFL-CIO*, 456 U.S. 273, 292 (1982); *see Easley*, 532 U.S. at 257 (finding clear error and reversing because "we do not believe that providing appellees a further opportunity to make their . . . arguments in the District Court could change th[e] result").

The apparent premise behind Judge Brown's argument for remand is that Latif might offer testimony so compelling that it would shake our confidence in the Report and overcome any doubt about Latif's credibility. But what testimony could possibly accomplish so much? If Latif were to repeat on the stand the same unpersuasive assertions he made in his declaration—assertions that are inconsistent with his earlier statements to interrogators at Guantanamo Bay and fail to offer *any* explanation for his inculpatory statements contained in the Report—the district court would have no choice but to disbelieve him. "Credibility involves more than demeanor" and instead "apprehends the over-all evaluation of testimony in light of its rationality or internal consistency and the manner in which

~~SECRET~~ 13 ~~SECRET~~

it hangs together with other evidence." *United States v. McCoy*, 242 F.3d 399, 408 n.15 (D.C. Cir.) (internal quotations omitted), *cert. denied*, 534 U.S. 872 (2001); *see also Anderson*, 470 U.S. at 575 ("[F]actors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."). If, on the other hand, Latif were to change his story once again on remand, the very fact that he "made inconsistent statements . . . would tend to undermine his credibility." *United States v. Stover*, 329 F.3d 859, 867–68 (D.C. Cir. 2003), *cert. denied*, 541 U.S. 1018 (2004). Latif's credibility would suffer even if he largely repeated the story in his declaration but also decided to embellish it with additional details—perhaps in some attempt to explain away the Report—because "[p]rior statements that omit details covered at trial are inconsistent if it would have been 'natural' for the witness to include them in the earlier statement." *United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991). In short, Latif could only dig himself deeper into a hole on remand.[6] Because the record can reasonably be viewed in only one way—that is, against him—I would not remand simply to give Latif a shovel but would instead conclude the litigation with the only result the evidence allows: that the government has indeed "shown that Latif is part of Al Qaeda or

---

[6]Indeed, even Latif's continued *failure* to testify would likely work against him. Majority Op. at 37–38; *see Mitchell v. United States*, 526 U.S. 314, 328 (1999) (" '[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.' " (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976))).

SECRET 14 SECRET

the Taliban." *Latif*, 2010 WL 3270761, at *1, slip op. at 3.

SECRET                                            SECRET

TATEL, *Circuit Judge*, dissenting: The government's "primary" piece of evidence, Appellants' Br. 10, is a single report: ███████████████████████████████ (the Report) ███████████████████████████████

After carefully laying out the parties' arguments about the Report's internal and external indicia of reliability, the district court found it "not sufficiently reliable to support a finding by a preponderance of the evidence that Latif was recruited by an Al Qaeda member or trained and fought with the Taliban." *Abdah (Latif) v. Obama*, No. 04-cv-01254, slip op. at 25 (D.D.C. July 21, 2010). According to the district court, "there is a serious question as to whether the [Report] accurately reflects Latif's words, the incriminating facts in the [Report] are not corroborated, and Latif has presented a plausible alternative story to explain his travel." *Id.* at 26. The government concedes that its case for lawfully detaining Latif "turn[s]" on the Report. Appellants' Br. 5. This, then, represents a first among the Guantanamo habeas appeals in this circuit: never before have we reviewed a habeas grant to a Guantanamo detainee where all concede that if the district court's fact findings are sustained, then detention is unlawful. *Cf. Almerfedi v. Obama*, No. 10-5291, 2011 WL 2277607, at *4–5 (D.C. Cir. June 10, 2011) (reversing habeas grant and finding detention lawful based on conceded facts and facts found by the district court); *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011) (same); *Al-Adahi v. Obama*, 613 F.3d 1102, 1103, 1111 (D.C. Cir. 2010) (same).

But rather than apply ordinary and highly deferential clear error review to the district court's findings of fact, as this circuit has done when district courts have found the government's primary evidence *reliable*, the court, now

~~SECRET~~ 2 ~~SECRET~~

facing a finding that such evidence is *unreliable*, moves the goal posts. According to the court, because the Report is a government-produced document, the district court was required to presume it accurate unless Latif could rebut that presumption. Maj. Op. at 11. In imposing this new presumption and then proceeding to *find* that it has not been rebutted, the court denies Latif the "meaningful opportunity" to contest the lawfulness of his detention guaranteed by *Boumediene v. Bush*, 553 U.S. 723, 779 (2008).

Compounding this error, the court undertakes a wholesale revision of the district court's careful fact findings. Flaws in the Report the district court found serious, this court now *finds* minor. Latif's account, which the district court found plausible and corroborated by documentary evidence, this court now *finds* "hard to swallow," Maj. Op. at 39. ████ ████████████████████████████ the district court found did not implicate Latif, this court now *finds* do in fact implicate him. And on and on, all without ever concluding that the district court's particular take on the evidence was clearly erroneous. *But see* Fed. R. Civ. P. 52(a)(6) ("Finding of facts, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . . .").

In Part I, I explain why the district court committed no error in declining to apply a presumption of regularity to the Report. In Part II, I apply the deferential clear error standard this circuit has used throughout these Guantanamo habeas cases. Finding no clear error, I would affirm the district court's grant of the writ of habeas corpus.

I.

All agree that this case turns on whether the district court

correctly found that the government's key piece of evidence, the Report, was unreliable. And all agree that the "question whether evidence is sufficiently reliable to credit is one we review for clear error." *Al Alwi v. Obama*, No. 09-5125, 2011 WL 2937134, at *6 (D.C. Cir. July 22, 2011). Our disagreement centers on whether the district court was required to afford the Report a presumption of regularity.

The presumption of regularity stems from a humble proposition—that "[public officers] have properly discharged their official duties." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)). The contours of the presumption are best understood by how courts typically apply it. For example, courts assume that "official tax receipt[s]" are properly produced, *Riggs Nat'l Corp. v. Comm'r*, 295 F.3d 16, 21 (D.C. Cir. 2002), that state court documents accurately reflect the proceedings they describe, *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985), that mail was duly handled and delivered, *Legille v. Dann*, 544 F.2d 1, 7 n.39 (D.C. Cir. 1976), and that agency actions in the ordinary course of business are undertaken on the basis of fact, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (citing *Pacific States Box & Basket Co. v. White*, 296 U.S. 176, 185 (1935)).

These cases—in fact every case applying the presumption of regularity—have something in common: actions taken or documents produced within a process that is generally reliable because it is, for example, transparent, accessible, and often familiar. As a result, courts have no reason to question the output of such processes in any given case absent specific evidence of error. Such a presumption rests on common sense. For instance, courts have no grounds to credit a defendant's allegation that "the state court trial docket" or

~~SECRET~~ 4 ~~SECRET~~

"the waiver of trial by jury form" contain inaccurate information when that defendant has no support other than a self-serving allegation. *See Thompson v. Estelle*, 642 F.2d 996, 998 (5th Cir. 1981) (noting that the "district court could properly rely upon the regularity of the state court's documents in preference to [the appellant's] self-serving testimony"). Courts presume accuracy because they can trust the reliability of documents produced by such processes. Courts and agencies are hardly infallible, but for the most part we have sufficient familiarity and experience with such institutions to allow us to comfortably rely on documents they produce in the ordinary course of business.

In saying that "[c]ourts regularly apply the presumption . . . [to] processes that are anything but 'transparent,' 'accessible,' and 'familiar,' " Maj. Op. at 13, this court cites a single case where we presumed the accuracy of a tax receipt from the Central Bank of Brazil for purposes of claiming foreign tax credits under the Internal Revenue Code. *See id.* at 13 (citing *Riggs Nat'l Corp.*, 295 F.3d at 20–22). As the Supreme Court has held, the presumption of regularity applies to "the actions of tax officials," and the "records of foreign public officials." *See Riggs Nat'l Corp.*, 295 F.3d at 20 (citing Supreme Court cases). But again, this is because we have no reason to question or be concerned with the reliability of such records.

By contrast, the Report at issue here was produced in the fog of war by a clandestine method that we know almost nothing about. It is not familiar, transparent, generally understood as reliable, or accessible; nor is it mundane, quotidian data entry akin to state court dockets or tax receipts. Its output, a ███████████████ intelligence report, was, in this court's own words, "prepared in stressful and chaotic conditions, filtered through interpreters, subject to

transcription errors, and heavily redacted for national security purposes." Maj. Op. at 6. Needless to say, this is quite different from assuming the mail is delivered or that a court employee has accurately jotted down minutes from a meeting.

To support its approach here, this court invokes presumptions of regularity for state court fact-finding and for final judgments in criminal habeas proceedings. *See id.* at 12–13. Aside from the abstract and uncontroversial proposition that courts should be sensitive to the separation of powers as well as to federalism, *id.* at 12, the analogy makes little sense. State court judgments and fact findings arise out of a formal and public adversarial process where parties generally have attorneys to zealously guard their interests, and where neutral state court judges, no less than federal judges, pledge to apply the law faithfully. That federal courts give a presumption of regularity to judgments and fact findings that emerge from such a process, where criminal defendants have ample opportunity to challenge adverse evidence, *see Lackawanna Cnty. Dist. Att'y v. Coss,* 532 U.S. 394, 402–03 (2001), provides no reason for habeas courts also to presume the accuracy of ███████████████ intelligence reports prepared in the fog of war. Indeed, unlike statutory habeas, where federal review follows state court proceedings, constitutional habeas is the only process afforded Guantanamo detainees. *Cf. Boumediene,* 553 U.S. at 780 ("It appears that the common-law habeas court's role was most extensive in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention. Notably, the black-letter rule that prisoners could not controvert facts in the jailer's return was not followed (or at least not with consistency) in such cases.").

In its analysis, this court ignores a key step in the logic of applying a presumption of regularity, namely, that the challenged document emerged from a process that we can safely rely upon to produce accurate information. Reliability, not whether an official duty was performed, *cf.* Maj. Op. at 6, is the touchstone inquiry in every case this court cites. For example, in a probation revocation decision by the Seventh Circuit—which, incidentally, never uses the term "regularity," *see United States v. Thomas*, 934 F.2d 840 (7th Cir. 1991)— the court found that the probation report "was of the type that generally carries a presumption of *reliability*," *id.* at 846 (emphasis added). A probation officer not only "testified [and was cross-examined] about the preparation, maintenance, and interpretation of special reports prepared by the probation office" but also "applied that . . . knowledge to [the report at issue]." *Id.* at 842. Given that testimony, and given also that "the district court . . . had reviewed the report 'many times,' " the Seventh Circuit saw no reason to think the report was "inaccurate." *Id.* at 846. Reinforcing its emphasis on the importance of assessing reliability, the Seventh Circuit cited an earlier decision, *United States v. Verbeke*, where it had found admissible a report produced by a drug treatment center because the report was found to be "reliable," because the defendant had an opportunity to cross-examine its author, and because no evidence discredited it. 853 F.2d 537, 539 (7th Cir. 1988). These decisions do not, as this court now does, ask only whether an official duty was regularly performed; rather, they examine the reliability of the proffered evidence and the process that produced it. As yet another decision the court cites puts it, courts will permit "the introduction of *'demonstrably reliable'* hearsay evidence in probation revocation proceedings." *United States v. McCallum*, 677 F.2d 1024, 1026 (4th Cir. 1982) (emphasis added).

To be sure, the government in this case has produced a declaration stating ██████████████████████████████████████████████████████████████████████████████ *see* Maj. Op. at 21 (quoting this affidavit). But we have no idea what the ██████████████ is, nor anywhere near the level of familiarity or experience with that course of business that would allow us to comfortably make presumptions about whether the output of that process is reliable. *Cf. Bismullah v. Gates*, 501 F.3d 178, 185–86 (D.C. Cir. 2007) (finding that it was "not at all clear" that even the Combatant Status Review Tribunal was "entitled to a presumption of regularity . . . because a CSRT does not have the transparent features of the ordinary administrative process and the [military officer charged with obtaining and reviewing evidence] is not the final agency decisionmaker"). Of course, we may take some assurance from the fact that the Executive Branch acts in good faith when carrying out its duties. But the very point of *Boumediene* is to ensure that detainees have a "meaningful opportunity" to subject the Executive's detention decisions to scrutiny by an independent Article III court.

This is not to say that reports similar to the one at issue here are necessarily unreliable. Perhaps after careful scrutiny district courts will conclude that many are reliable. *See, e.g., Khan v. Obama*, No. 10-5306, 2011 WL 3890843, at *4–5 (D.C. Cir. Sept. 6, 2011). My point is far more modest: because we are unfamiliar with this highly secretive process, and because we have no basis on which to draw conclusions about the general reliability of its output, we should refrain from categorically affording it presumptions one way or the other. This approach does not reflect "skeptic[ism]" or "cynic[ism]" about the Executive Branch, Maj. Op. at 8—it is nothing more than what *Boumediene* directs us to do. *See*

SECRET 8 SECRET

*Boumediene*, 553 U.S. at 786 (requiring habeas court "to *assess*," not presume, "the sufficiency of the Government's evidence" (emphasis added)). And indeed, from time immemorial courts have been skeptical of hearsay evidence without implying bad faith or cynicism about the Executive (or whoever is attempting to present that evidence).

. Nor am I suggesting that district courts should give no weight to sworn declarations by government officials that such reports are ██████████ because ████████████ ████████████████████████████████████ Up to a point, the declaration does provide support for the Report's reliability. For one thing, it suggests that the Report is in fact authentic, i.e., that it really is an interrogation summary. Relying on similar declarations, many district courts that have heard Guantanamo habeas cases—including the district court here— have adopted a presumption of *authenticity* for government records like the Report even while consistently rejecting a presumption that such records are *accurate. See, e.g., Alsabri v. Obama*, 764 F. Supp. 2d 60, 66–67 & n.8 (D.D.C. 2009); *Hatim v. Obama*, 677 F. Supp. 2d 1, 10 (D.D.C. 2009), *vacated on other grounds*, F.3d 720 (D.C. Cir. 2011); *Ahmed v. Obama*, 613 F. Supp. 2d 51, 54–55 (D.D.C. 2009). *But see, e.g., Al Kandari v. United States*, 744 F. Supp. 2d 11, 19–20 (D.D.C. 2010) (declining to adopt a presumption of either authenticity or accuracy). Going one step further, habeas courts might also properly rely on the analogy between intelligence reports and business records to conclude that "[t]he fact that these reports were prepared by government agents in the course of their normal intelligence gathering duties provides a degree of support for their reliability." *Alsabri*, 764 F. Supp. 2d at 68. I thus have no problem with

the observation, made in a decision cited by the concurrence, Con. Op. at 10, that "the basic fact that public officials usually do their duty . . . has . . . that quality and quantity of probative value to which it is entitled." *Stone v. Stone*, 136 F.2d 761, 763 (D.C. Cir. 1943). As that decision goes on to say, however, "the probative strength of the evidence is for the [factfinder] to consider." *Id.* Nor do I quarrel with the observation that, as a general matter, government records consisting of interrogation summaries with inculpatory admissions are more likely to be reliable evidence than documents reporting third-party (and sometimes anonymous) hearsay.

But this court goes well beyond these modest conclusions—and well beyond what the government actually argues in its briefs—when it relies on the bare fact that government officials have incentives to maintain careful intelligence reports as a reason to require district courts to presume that such reports are not only authentic, but also accurate, despite circumstances casting their reliability into serious doubt. *See* Appellants' Br. 30–31 (arguing in passing that the district court in this case erred by failing to give *any* weight to the general presumption that government officials carry out their duties properly but never urging adoption of a categorical, burden-shifting presumption of regularity); Appellants' Reply Br. 22–24 (same). One need imply neither bad faith nor lack of incentive nor ineptitude on the part of government officers to conclude that █████████ compiled in the field by █████████ in a █████ █████████ near an █████████████ that contain multiple layers of hearsay, depend on translators of unknown quality, and include cautionary disclaimers that █████████ ████████████████████ are prone to significant errors; or, at a minimum, that such reports are insufficiently regular,

reliable, transparent, or accessible to warrant an automatic presumption of regularity.

It is thus not at all surprising that our court has never before applied the presumption of regularity in Guantanamo Bay habeas cases despite numerous opportunities to do so. For instance, in *Barhoumi*, the government, seeking to establish that the petitioner was "part of" an al Qaida associated militia, relied on an intelligence report that included an English translation of a diary allegedly authored by a member of that militia. *Barhoumi v. Obama*, 609 F.3d 416, 420 (D.C. Cir. 2010). Among other challenges to this evidence, we considered petitioner's argument that the government's failure to make a copy of the diary available in its original Arabic or to provide information regarding the qualifications or motives of the translator raised doubts about reliability. Although we characterized this objection as "troubling" and "accept[ed] that the additional layer of hearsay added by the diary's translation render[ed] it somewhat less reliable than it otherwise would [have] be[en] (particularly if the government had provided information regarding its translation)," we nonetheless reviewed the diary's internal and external indicia of reliability and concluded that the district court had not clearly erred by relying on it. *Id.* at 430–32. Had we believed that a presumption of regularity applied to the translation recorded in the intelligence report, none of that extended analysis would have been necessary. Instead, we would have simply presumed the document's accuracy—and expected the district court to do the same. As my colleagues begrudgingly admit, Maj. Op. at 16–17, that is exactly what the government asked us to do in *Barhoumi*, but to no avail. *See* Appellees' Br. 52, *Barhoumi*, 609 F.3d 416 (No. 09-5383) (arguing that "translations are *presumed* to be accurate in the absence of evidence to the contrary" (emphasis added)).

~~SECRET~~ 11 ~~SECRET~~

We followed exactly the same playbook in *Bensayah* and *Al Alwi*, two cases in which we reviewed district court reliability determinations about the precise type of government intelligence document at issue here ███████████████████████████ *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010). In *Bensayah*, rather than granting the government's evidence a presumption of regularity on the grounds that it consisted of government records regularly kept, we carefully evaluated other evidence purporting to corroborate the document's contents, ultimately concluding that the district court committed clear error by finding that document reliable. *See id.* at 726–27. Nor did we apply a presumption of regularity in *Al Alwi* even though the government's evidence, as here, consisted of interrogation summaries allegedly reporting the petitioners' own statements and even though those documents had *greater* indicia of reliability than the Report at issue in this case. Indeed, in *Al Alwi* we adopted a rule—that "the [district] court *must* take the absence of corroboration into account in assessing the reliability of petitioner's out-of-court statements," *Al Alwi*, 2011 WL 2937134, at *6 (emphasis added)—that directly conflicts with this court's observation that "[b]y definition, a presumptively reliable record needs no additional corroboration unless the presumption is rebutted." Maj. Op. at 35.

And most recently, in *Khan v. Obama*, we reviewed the district court's finding that the government's informant reports were reliable. Again, rather than applying a presumption of regularity, we spent page after page carefully evaluating the reliability of the reports. In affirming the district court's determination that the documents were reliable, we emphasized external indicia of reliability, such as

~~SECRET~~ 12 ~~SECRET~~

photographs and items seized from petitioner's home, as well as detailed government declarations explaining why the reports were reliable. *Khan*, 2011 WL 3890843, at *7–10.

Our approach in *Barhoumi*, *Al Alwi*, *Bensayah*, and *Khan* reflects a careful and conscious balancing of the important interests at stake. While federal courts typically exclude hearsay unless it falls within a specific exception, *see* Fed. R. Evid. 803, we understand that in the context of enemy combatant proceedings such evidence may be the best available. *Barhoumi*, 609 F.3d at 427. Thus, rather than acting on our deep, historically rooted skepticism of hearsay by excluding such evidence altogether, we admit it but are careful to assign it no more weight than it is worth as measured by any available indicia of reliability. *See id.* (holding that hearsay evidence is "always admissible" in such proceedings, but that it "must be accorded weight only in proportion to its reliability"); *see also Al-Bihani v. Obama*, 590 F.3d 866, 879 (D.C. Cir. 2010). The presumption of regularity, which this court expressly premises on "defer[ence] to Executive branch expertise," Maj. Op. at 12–13, disturbs this careful balance, substituting a presumption in place of careful district court "review and assess[ment of] all evidence from both sides." *Al-Bihani*, 590 F.3d at 880. Given the degree to which our evidentiary procedures already accommodate the government's compelling national security interests by admitting all of its evidence, including hearsay; given the heightened risk of error and unlawful detention introduced by requiring petitioners to prove the inaccuracy of heavily redacted government documents; and given the importance of preserving "the independent power" of the habeas court "to assess the actions of the Executive" and carefully weigh its evidence, *id.*, I find this court's departure from our practice deeply misguided.

To be clear, I make no claim that anything in *Barhoumi*, *Bensayah*, *Al Alwi*, *Khan*, or any of our other Guantanamo habeas cases affirmatively rules out the possibility of applying a rebuttable presumption of accuracy to certain kinds of government evidence in some circumstances. My point is only that our cases, proceeding in the very common-law-like fashion that my colleagues describe, *see* Maj. Op. at 19, have endorsed and applied a careful and fine-grained approach to the assessment of reliability. We have applied that approach to claims that a document was mistranslated (*Barhoumi*) and to claims that a document is insufficiently corroborated (*Al Alwi*, *Khan*)—two of the issues in this case. We have applied that approach to a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (*Bensayah*, *Al Alwi*), and to government interrogation summaries (*Al Alwi*)—the same type and category of documents as the Report. Following that approach, we have both upheld (*Barhoumi*, *Al Alwi*, *Khan*) and overturned (*Bensayah*) district court findings that a government document is reliable. The only feature of this case not previously encountered is that here the government lost: the district court found the dispositive government Report *unreliable* and *granted* a writ of habeas corpus.

Moreover, the presumption discards the unanimous, hard-earned wisdom of our district judges, who have applied their fact-finding expertise to a wide array of government hearsay evidence. In doing so, they have developed a uniquely valuable perspective that we ought not so quickly discard. These judges, including the district judge in this case, have unanimously rejected motions to give government evidence a presumption of accuracy. *See, e.g., Alsabri*, 764 F. Supp. 2d at 66 (noting "ample reason" to decline to presume the accuracy of the government's exhibits and explaining that circuit precedent supported its approach); *Al Kandari*, 744 F. Supp. 2d at 19 ("Simply assuming the Government's evidence is

accurate and authentic does not aid [the reliability] inquiry."); *Ahmed*, 613 F. Supp. 2d at 55 ("[T]here is absolutely no reason for this Court to *presume* that the facts contained in the Government's exhibits are accurate."); *see also* Benjamin Wittes, Robert M. Chesney & Larkin Reynolds, The Emerging Law of Detention 2.0, at 52 (May 12, 2011) (indicating that "none of the publicly available rulings on the issue have favored the government"), *available at* http://www.brookings.edu/papers/2011/05_guant anamo_wittes.aspx. Rather than ignoring serious doubts about government evidence by presuming its accuracy, our district courts have instead done exactly what we expect of careful factfinders and precisely what our case law demands: scrupulously assess the reliability of each piece of evidence by applying "a long, non exclusive list of factors . . . such as: consistency or inconsistency with other evidence, conditions under which the exhibit and statements contained in it were obtained, accuracy of translation and transcription, personal knowledge of [the] declarant . . . , levels of hearsay, recantations, etc." *Ahmed*, 613 F. Supp. 2d at 55; *see also Sulayman v. Obama*, 729 F. Supp. 2d 26, 42 (D.D.C. 2010) ("As to many of the intelligence reports [the government] relies upon . . . there is nothing in the record regarding the qualifications of the interpreters used in those interrogations to render a reliable interpretation. There are other intelligence reports . . . in which the government has failed to provide foundational evidence that those statements 'were made under circumstances that render them intrinsically reliable or were made by reliable sources.' " (citation omitted)).

Brushing aside these district court rulings, my colleagues think that those courts "may" have been denying a presumption of accuracy because they "[c]onfus[ed]" it for a presumption of truth, Maj. Op. at 9, the difference being that the latter presumes the content of a report is *true*, whereas the

SECRET 15 SECRET

former presumes that the government official filling out the report did so accurately—i.e., that in doing the interview, he correctly heard, translated, recorded, and summarized the content embodied in the report. The district courts have suffered from no such confusion, nor do I, for the core question presented in this case is whether the Report *accurately* reflects Latif's words. Unsurprisingly, my colleagues cite not a single case where a district court refers to a presumption of truth or, for that matter, a single instance in which the government argued for a presumption of truth rather than a presumption of accuracy. They cite *Ahmed*, but nowhere did the district court there say that "the requested presumption would go to the truth of 'the facts contained in the Government's exhibits.' " Maj. Op. at 10 (citing *Ahmed*, 613 F. Supp. 2d at 55). Rather, the district court denied a presumption of *accuracy*, doing so for several reasons, including the need to assess the "accuracy of translation and transcription," and not just because of alleged torture, as this court now implies. 613 F. Supp. 2d at 55; *see also Al Mutairi v. United States*, 644 F. Supp. 2d 78, 84 (D.D.C. 2009) (expressing concern that the government's evidence "is based on reports of interrogations (often conducted through a translator) where translation or transcription mistakes may occur"). In *Al Mutairi*, the district court even pointed to evidence in that very case exemplifying such problems: "for over three years" the government had, "based on a typographical error in an interrogation report," erroneously insisted "that Al Mutairi manned an anti-aircraft weapon in Afghanistan." *Id.*; *see also Al Rabiah v. United States*, 658 F. Supp. 2d 11, 18 (D.D.C. 2009) (noting "discrepan[cies]" between two reports summarizing *the same interrogation* that the government had made no attempt to reconcile); *Al Odah v. United States*, 648 F. Supp. 2d 1, 6 (D.D.C. 2009) (noting that "interrogators and/or interpreters included incorrect dates in *three* separate reports that were submitted into evidence based

UNCLASSIFIED//FOR PUBLIC RELEASE

on misunderstandings between the Gregorian and the Hijri calendars"). Indeed, the same district court whose decision we now review explained in another Guantanamo case that it "has learned from its experience with these cases that the interrogation summaries and intelligence reports on which [the Government] rel[ies] are not necessarily accurate and, perhaps more importantly, that any inaccuracies are usually impossible to detect." *Odah v. Obama*, No. 06-cv-1668, slip op. at 3 (D.D.C. May 6, 2010); *see also id.* ("[T]here are many steps in the process of creating these documents in which error might be introduced[:] . . . the interpreter must understand the question posed and correctly translate it; the interviewee must understand the interpreter's recitation of the question; the interpreter must understand the interviewee's response and correctly interpret it; the interrogator must understand the interpreter's translation of the response; the interrogator must take accurate notes of what is said; and the interrogator must accurately summarize those notes when writing the interrogation summary at a later time."). Of course, concerns about the accuracy of the reports necessarily raise concerns about their truth. But there are no grounds for assuming the district courts are confused about this distinction.

In support of a presumption of regularity, this court relies on the plurality opinion in *Hamdi*, which, applying Due Process analysis, states that "the Constitution would not be offended by a presumption in favor of the Government's evidence" in enemy combatant proceedings for citizen detainees "so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Hamdi v. Rumsfeld*, 542 U.S. 507, 534 (2004) (plurality opinion). According to this court, because the *Hamdi* plurality provisionally blessed such a general presumption, its own presumption requiring deference to official government

documents must pass constitutional muster. Maj. Op. at 7. But the *Hamdi* plurality made clear that the presumption it sanctioned would apply only if the government "puts forth *credible* evidence that the habeas petitioner meets the enemy-combatant criteria." 542 U.S. at 534 (emphasis added); *see also Almerfedi*, 2011 WL 2277607, at *4 & n.7 (explaining the *Hamdi* framework requires the government to "put forth credible facts" tending to show that the petitioner meets the detention standard, such as that he received military training at an al Qaida camp, which the petitioner can then rebut with his own facts and explanation). In other words, a presumption is acceptable if the government can first show that its evidence is credible, but the *Hamdi* plurality never suggested that the government could make that showing by relying on a presumption that government-produced evidence is credible and accurate. It is the latter presumption that is at issue here and about which the *Hamdi* plurality had nothing to say. Given that the district court in this case concluded that the Report was "not sufficiently reliable," *Latif*, slip op. at 25— i.e., that it was not credible—the court's reliance on the *Hamdi* plurality to defend its presumption of regularity is misplaced.

This court believes that our decisions in *Al-Bihani*, 590 F.3d 866, and *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008) support the "continuing viability" of applying a presumption of regularity to Guantanamo habeas cases. Maj. Op. at 14. In *Al-Bihani*, however, although the district court "reserved [the] authority" granted by its case management order to presume the government's evidence accurate, it went on to "assess[] the hearsay evidence's reliability as required by the Supreme Court." *Al-Bihani*, 590 F.3d at 880. Even the government agrees with this view of *Al-Bihani*. *See* Appellees' Br. 52, *Barhoumi*, 609 F.3d 416 (No. 09-5383) ("In this case, *as in Bihani*, the district court did not presume the accuracy or

SECRET 18 SECRET

authenticity of the government's evidence." (emphasis added)). The most one can say about *Al-Bihani* on this issue is that we suggested—in dicta—that a district court *could* apply a presumption to a particular piece of evidence *if* appropriate—a power the district court in that case declined to exercise. This is a far cry from the holding today—that all such reports and their underlying hearsay *must* be granted a presumption of regularity. As to *Parhat*, a pre-*Boumediene* case arising under the Detainee Treatment Act of 2005, it is true that the Act incorporated a "rebuttable presumption that the Government Evidence is genuine and accurate." Maj. Op. at 15 (emphasis removed). But in that case, we took the opportunity to clarify that, at a minimum, hearsay evidence "must be presented in a form, or with sufficient additional information, that permits [an assessment of] its reliability." *Parhat*, 532 F.3d at 849. As we recently reiterated, "[t]he government's evidence in *Parhat* was insufficient to enable the court to assess its reliability." *Khan*, 2011 WL 3890843, at *6. This hardly supports the proposition that courts *must* assume government reports like the one at issue here are accurate, especially given that the Supreme Court in *Boumediene* specifically found that the process provided by the Detainee Treatment Act was an inadequate substitute for the writ of habeas corpus. *See* 553 U.S. at 792.

In sum, given how and where we typically apply the presumption of regularity, and given the balance this circuit has already struck on how to deal with hearsay evidence in Guantanamo Bay cases, and given the seasoned observations of our district courts about the reliability of such evidence, the question still unanswered to my satisfaction is "Why?" Why does this court now require district courts to categorically presume that a government report—again, one created in a ▮▮▮▮▮▮ near an ▮▮▮▮▮▮▮ with multiple layers of hearsay, and drafted by unidentified translators and

scriveners of unknown quality—is accurate? Whether the presumption can be overcome by a preponderance of the evidence or by clear and specific evidence—this court never says which—I fear that in practice it "comes perilously close to suggesting that whatever the government says must be treated as true," *see Parhat*, 532 F.3d at 849. In that world, it is hard to see what is left of the Supreme Court's command in *Boumediene* that habeas review be "meaningful." 553 U.S. at 783.

But the court's assault on *Boumediene* does not end with its presumption of regularity. Not content with moving the goal posts, the court calls the game in the government's favor. Instead of remanding to give Latif an opportunity to rebut the presumption of regularity, this appellate court engages in an essentially de novo review of the factual record, providing its own interpretations, its own narratives, even its own arguments, *see* Maj. Op. at 20–52, and *finds* that "neither internal flaws nor external record evidence rebuts that presumption in this case," *id.* at 7. *But see Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) (where district court fact "findings are infirm because of an erroneous view of the law, a remand is the proper course"). To be sure, such a finding would be appropriate if the record supported "only one resolution of the factual issue." 456 U.S. at 292. But that cannot be the case where, as here, the question of reliability turns entirely on witness credibility, inferences drawn from errors and inconsistencies in the Report, and the resolution of conflicts in other record evidence, *see infra* Part II. Given the court's conclusion that the presumption has not been rebutted, remand may well be a "pointless exercise." Con. Op. at 1.

## II.

Rather than adopting a presumption of regularity, I would apply clear error review to the district court's findings of fact just as we have consistently done throughout our Guantanamo cases. *See, e.g., Almerfedi*, 2011 WL 2277607, at *3 (reviewing district court fact findings for clear error); *Al-Madhwani v. Obama*, No. 10-5172, 2011 WL 2083932, at *3 (D.C. Cir. May 27, 2011) (same); *Salahi v. Obama*, 625 F.3d 745, 750 (D.C. Cir. 2010) (same); *Al Odah v. United States*, 611 F.3d 8, 14–15 (D.C. Cir. 2010) (same); *Bensayah*, 610 F.3d at 723 (same); *Barhoumi*, 609 F.3d at 423–24 (same); *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010) (So long as "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it" and, critical to this case, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (citations omitted)). Under that standard, I would conclude that the district court committed no clear error by finding that the Report was insufficiently reliable; that it committed no clear error by crediting Latif's account of what happened only insofar as it needed to; and that it adequately addressed the other record evidence.

### A

The starting point, of course, is the Report itself. *See Awad*, 608 F.3d at 6–7 (holding that the same clear error standard applies to fact findings based on documentary evidence and inferences drawn from that evidence). The district court's primary concern about the Report related to the circumstances under which it was produced, circumstances that, according to the district court, increased the likelihood that mistakes had been made. In particular, the

court emphasized the ███████████████
████████████████████████████████████
████████ summarized in the Report and another
report produced around the same time. *Latif,* slip op. at ████
In addition, ████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████ The Report's heavy
redactions—portions of only ████ out of ██████ pages are
unredacted—make evaluating its reliability more difficult.
The unredacted portions nowhere reveal whether the same
person ████████████████████████████████
████████████████████████ or whether someone else
performed each of these tasks. And because all the other
████████ in the Report are redacted, the district court was
unable to evaluate the accuracy of ████████████ by
inquiring into the accuracy of the Report's ████████████
In view of all these concerns, the district court found it
especially troubling that neither the Report nor any of the
Government's other evidence "provide[s] any information
with which to confirm ████████████████████████
████████████████ used the high level of care necessary to
ensure ████████████████ was accurate." *Id.* at 26.

"[F]actual errors" in the Report reinforced the district
court's concerns. *Id.* Specifically, although the Report states
"that Latif said he had been to Jordan to accompany a friend
who needed medical care for his hand[,] . . . Latif has

repeatedly told interrogators, and has provided evidence to show, that he went to Jordan for treatment of an injury to his own, not a friend's, head, not hand." *Id.* at 15. In addition, the Report erroneously states that "Latif is unmarried and has no children," even though "a declaration Latif submitted for use in this litigation states that he is married and has a son." *Id.* Lastly, in what even my colleagues concede is an "obvious mistake," Maj. Op. at ▮ the Report's first page states that

███████████████████████████████████████

Also troubling the district court was the lack of "corroborating evidence for any of the incriminating statements in the [Report]." *Latif,* slip op. at 26. As the district court explained: "No other detainee saw Latif at a training camp or in battle. No other detainee told interrogators that he fled from Afghanistan to Pakistan, from Tora Bora or any other location, with Latif. No other type of evidence links Latif to Al Qaeda, the Taliban, a guest house, or a training camp." *Id.*

The district court properly weighed the cumulative effect of these subsidiary findings. *See Al-Adahi,* 613 F.3d at 1105–06. According to the district court, those findings "support[] an inference that poor translation, sloppy notetaking, ███████ or some combination of those factors resulted in an incorrect summary of Latif's words." *Latif,* slip op. at 26.

All of the concerns just described are obviously relevant to evaluating the Report's accuracy. It goes without saying that the circumstances under which the Report was produced and the evidence, or lack of evidence, of care taken to avoid

~~SECRET~~ 23 ~~SECRET~~

mistakes when the Report was produced shed light on that question. Likewise, it is undoubtedly probative of the Report's reliability that it contains factual errors, for the presence of a known error increases the likelihood that other information in the Report is inaccurate as well. And of course, it is also relevant that the government has offered no independent corroboration for any of the Report's incriminating facts. After all, skepticism about the trustworthiness of uncorroborated confessions has deep, historical roots, so much so that a criminal defendant "may not be convicted on his own uncorroborated confession." *Smith v. United States*, 348 U.S. 147, 152–53 (1954) (noting that the rule's "foundation lies in a long history of judicial experience with confessions"). And we recently made clear that in these Guantanamo habeas cases "the [district] court *must* take [such an] absence of corroboration into account in assessing the reliability of the petitioner's out-of-court statements." *Al Alwi*, 2011 WL 2937134, at *6 (emphasis added).

Moreover, none of the subsidiary fact findings the district court made about the Report itself were clearly erroneous. As this court acknowledges, "the [district] court cited problems with the Report itself, including its substantial redactions, ███ ███ its reference to Latif's 'hand' instead of his head injury, its internally inconsistent statements ███ ███ and the perceived lack of corroboration." Maj. Op. at 34–35. And this court agrees that "[t]he inconsistencies in the Report may suggest a document produced on the field by imperfect translators or transcribers." *Id.* at 27.

Nonetheless, this court insists, "[i]t is almost inconceivable," *id.* at 25, that the inculpatory information in

the Report could have resulted from "poor translation, sloppy notetaking█████████████████████ ██████████ or some combination of those factors," *Latif*, slip op. at 26. According to the court, there is too high a "level of inculpatory detail" in the Report for it to have resulted from such mistakes. Maj. Op. at 25. And because the incriminating statements "are intertwined with other details in the Report that persist in Latif's current account of his travels," the court believes, █████████████████████████████████ ████████████████████████████████████████

My colleagues' interpretation of the evidence is undoubtedly plausible. Yet when one accounts for all of the Report's various problems, the fact that admittedly true facts "are intertwined" with contested inculpatory ones also supports another plausible explanation, akin to what happens in the children's game of telephone. In that game, one child whispers a phrase to another, who in turn whispers it to a third, and so on, until the last child announces what he or she has heard. As anyone who has played well knows, the whole point of the game is that what the final child hears is both recognizably similar to the original statement and yet amusingly transformed. *Cf.* Carol D. Leonnig & Josh White, *An Ex-Member Calls Detainee Panels Unfair*, WASH. POST, June 23, 2007 (reporting former-Combatant Status Review Tribunal member, Lieutenant Colonel Stephen Abraham, as "equat[ing] the government hearsay presented [to the CSRTs] about detainees with a game of telephone" (internal quotation marks omitted)).

Now imagine the game when, as may have happened here, ██████████████████████████ and the Report produced "[i]n the field," with the assistance of "imperfect translators or transcribers," Maj. Op. at 27. And imagine further, as may also have happened here, that the "imperfect" translator may

~~SECRET~~ 25 ~~SECRET~~

have misheard Latif's exact words, or the interrogator may have misheard the "imperfect" translation, or the "imperfect" notetaker may have failed to transcribe precisely what was "imperfect[ly]" translated, or that whoever wrote up a summary based on those notes, ████████████ may have failed to understand what exactly that "imperfect" notetaker had written, or that some combination of all those things may have occurred. This problem is all the more exacerbated when—again as may have happened here—the same

████████████████████████ and fails to █████
██████████████████████████ until ████████████
███ As Latif's ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ —as so often
occurs in the game of telephone████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

And so, Latif's statement about a charity-worker named Ibrahim Al-Alawi from Ibb encouraging him to travel from Yemen may have become a reference to a jihadi recruiter; his statement about traveling to an Islamic Center in Kabul run by an imam named Abdul Fadel may have transformed into one about serving north of Kabul under an Afghan commander with the homophonous name Abu Fazl; and his statement about three teachers named Abu Bakr of the Arab Emirates, Awba of Kuwait, and Hafs of Saudi Arabia, may have turned into one about fellow Taliban soldiers with the similar sounding (or identical) names Abu Bakr, Abu Hudayfa, and Abu Hafs—just as his statement about a trip to Jordan for treatment of an injury to Latif's head became a statement about treatment for his friend's hand. Indeed, my colleagues nowhere disagree that all of the names and statements

SECRET 26 SECRET

appearing in the Report sound similar to names and statements Latif later made. And, although only █████████

that appear to have been ███████████████████ are in the record and unredacted, both contain details that also appear in ████████, details which an ██████████ might have ██████ if they were having trouble understanding ████████ say ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Obviously, moreover, we have no way of knowing whether the redacted ████████ likewise contain ██████ Given that the circumstances under which the Report was produced increased the probability of mistakes, given that the Report contains other "factual errors," and given that the government has failed to corroborate any of the Report's incriminating information, *Latif*, slip op. at 26, this explanation is at least plausible—the only question for us when reviewing fact findings, such as these, for clear error. *See Awad*, 608 F.3d at 7 (reiterating that "[i]f the district court's account of the evidence is plausible in light of the record in its entirety, the court of appeals may not reverse it" (quotation omitted)). *But see* Maj. Op. at 26 (conceding this explanation is "possible," yet incorrectly asserting that "the relevant question is whether th[e] hypothesis is likely").

**B**

The district court did not stop with the Report. It also "consider[ed] the explanation of events Latif has offered"— again in service of the critical question of whether the Report was "sufficiently reliable." *Latif*, slip op. at 27. According to

Latif, with the help of a charitable worker, he left Yemen in 2001 seeking free medical treatment for the lingering effects of a serious head injury suffered in a 1994 car accident. Although the government challenges Latif's claim that he left Yemen in 2001 seeking medical treatment, it never disputes that "in 1994, [Latif] sustained head injuries as the result of a car accident and [that] the Yemeni government paid for him to receive treatment" in Jordan at that time. *Id.* at 5.

Besides his own narrative, Latif also offered documentary evidence to corroborate his account. Three documents are particularly noteworthy. The first, "a letter, dated August 21, 1994, from a doctor at the Islamic Hospital in Amman, Jordan," confirms "that Latif 'was admitted' on July 9, 1994 'following a head injury.' " *Id.* at 23 (quoting letter). The second, "a letter dated August 18, 1999 from Yemen's Ministry of Public Health," states "that '[w]e recommend that [Latif] return to the previous center outside for more tests and therapeutic and surgical procedures at his own expense.' " *Id.* (alterations in original) (quoting letter, which also states that Latif "is hard of hearing" and that "a wide circular hol[e] was detected in [Latif's] left eardrum"). And the third—the most important—is Latif's intake form dated December 31, 2001 (i.e., shortly after he was seized ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Filled out when Latif was taken into United States custody, the intake form states that Latif was in possession of "medical papers" when seized traveling from Afghanistan to Pakistan. *Id.* at 23 & n.12.

This documentary evidence, the district court found, "corroborat[ed]" Latif's "plausible" story. *Id.* at 26–27. The district court also rejected the government's contention that Latif's exculpatory account was a "cover story" and found the government's "attack[s]" on the "credibility of [the] story . . .

unconvincing." *Id.* at 26. This too was an obviously relevant evidentiary consideration. A petitioner's version of events, should he choose to provide one, can be relevant when assessing the government's evidence. After all, the more believable the petitioner's exculpatory account, the greater the reason to doubt the government's inculpatory one. *Cf., e.g.,* *Al-Adahi,* 613 F.3d at 1107 (weighing petitioner's "false exculpatory statements" in the government's favor). Having thus assessed Latif's story positively, and given that the story contradicts incriminating information contained in the Report, the district court relied on the story to support its finding that the Report is "not sufficiently reliable." *Latif,* slip op. at 25.

Although agreeing that Latif's story is relevant, my colleagues nonetheless conclude that by describing it as "plausible" and "not incredible," the district court never actually credited that account. But "reading the district court's explanation in [such] a parsed manner that overlooks its meaning in context" is inconsistent with clear error review. *United States v. Brockenborrugh,* 575 F.3d 726, 741 (D.C. Cir. 2009). Here is what the district court actually said about Latif's story:

> The Court makes this ruling [i.e., about the accuracy of the Report] having taken into consideration the explanation of events Latif has offered. Latif's story is not without inconsistencies and unanswered questions, but it is supported by corroborating evidence provided by medical professionals and it is not incredible. [The district court then rejected the government's theory that Latif had told inconsistent stories over the course of his detention and was therefore telling a "cover story." The district court reasoned that the government's theory was based on just "two isolated statements," one of which "does

> not contradict Latif's version of events." Finally, the district court found the government's] other arguments attacking the credibility of Latif's story ... similarly unconvincing. The smaller inconsistencies to which [the government] ha[s] pointed may be no more than misstatements or mistranslations; even if some details of Latif's story have changed over time, for whatever reason, its fundamentals have remained the same.

*Latif*, slip op. at 27–28. What else could the district court have meant other than that it found Latif's account convincing enough, plausible enough, consistent enough, and corroborated enough to give it at least some weight against the government's evidence? And as we have held, "[m]erely because a particular piece of evidence is insufficient, standing alone, to prove a particular point does not mean that the evidence 'may be tossed aside and the next [piece of evidence] may be evaluated as if the first did not exist.' " *Salahi*, 625 F.3d at 753 (alteration in original) (quoting *Al-Adahi*, 613 F.3d at 1105). After all, it is the government that bears the burden to demonstrate the lawfulness of detention, and here the district court concluded that the government had failed to meet that burden because (1) "there is a serious question as to whether the [Report] accurately reflects Latif's words" given (1a) the circumstances under which it was produced and (1b) the "factual errors" it contains; (2) "the incriminating facts in the [Report] are not corroborated[;] and [(3)] Latif has presented a plausible alternative story to explain his travel." *See Latif*, slip op. at 26. It is in just this circumstance—where doubts about the government's evidence and confidence in the detainee's story combine with other evidence to fatally undermine the government's case— that a detainee may prevail even without the district court needing to credit the detainee's story by a full preponderance

of the evidence. To require otherwise would, in effect, inappropriately shift the burden of proof to Latif.

Given that the district court found Latif's story entitled to at least some weight and given that such a finding could properly guide its evaluation of the government's evidence, the only remaining question for us is whether that finding was clearly erroneous. It was not. As this court itself acknowledges, Latif's story, on its own terms, is not "intrinsic[ally] implausib[le]." Maj. Op. at 39. And that observation is reinforced by corroborating evidence showing that Latif needed to leave Yemen for medical care in 1994, that Yemen's Ministry of Public Health recommended he do so again in 1999, and that Latif had medical papers with him when seized crossing into Pakistan. That a trip abroad for medical care had been necessary, not once but twice, makes it more likely that Latif would have needed to travel abroad for medical care in 2001 as well. And the fact that Latif's condition was still serious enough to require such a trip in 1999, five years after he was first injured, increases the odds that the injury continued to be that serious two years later in 2001. Equally important, the most plausible reason for why Latif would have had medical papers in his possession when first seized is that his trip in fact had a medical purpose.

Attempting to cast doubt on the district court's favorable assessment of Latif's account, this court insists that the district court "toss[ed] . . . aside" inconsistencies in Latif's account. *Id.* at 45; *see also id.* at 42–45. But the district court did no such thing. It expressly recognized those inconsistencies, *Latif,* slip op. at 24–25 (summarizing the alleged inconsistencies); *id.* at 27 ("Latif's story is not without inconsistencies and unanswered questions."), ultimately finding the government's "attack[ on] the credibility of Latif's story" based on those inconsistencies "unconvincing." *Latif,*

slip op. at 27. Particularly significant to the district court was the fact that the "fundamentals [of Latif's story] have remained the same." *Id.* As Latif points out, those fundamentals—appearing in more than a dozen interrogation summaries and statements from December 31, 2001 ███████████████ until May 10, 2009—"include [Latif's] adamant denials of any involvement with al Qaida or the Taliban; his serious head injury from a car accident in Yemen; his inability to pay for the necessary medical treatment; and his expectation and hope that Ibrahim Alawi would get him free medical care." Appellee's Br. 57. Indeed, at least some in the government apparently agree. The commanding officer of the Defense Department's Criminal Investigative Task Force noted in a June 16, 2004 memo that Latif's statements to interrogators had "been relatively consistent." Ex. 80, Memorandum from Criminal Investigative Task Force to General Counsel, Department of Defense (June 16, 2004). Moreover, before making too much of smaller inconsistencies it is important to remember that they appear not in verbatim transcripts prepared by a court reporter with the aid of an audio or video recording, but rather in brief summaries of translated interrogations. As mentioned above, it would be unsurprising to discover that minor errors crept in as Latif's account passed from his mouth to a translator (of unknown ability) to an interrogator to the interrogator's notes and finally to the interrogator's summary of those notes—the last of which represents the only evidence in the record of what Latif actually said in each of his interrogations. As we remarked in another Guantanamo Bay habeas case, "[t]he task of resolving discrepancies among the various accounts offered into evidence is quintessentially a matter . . . for the district judge sitting as the fact-finder." *Al-Madhwani*, 2011 WL 2083932, at *5 (internal quotation marks omitted).

Rather than applying clear error review to the district court's resolution of such discrepancies, this court suggests its own story—a story not found by the district court, never argued by the government, and based on its own review of the raw evidence—about how Ibrahim may have "promised Latif the medical treatment he needed to induce him to join the Taliban." Maj. Op. at 27–28. Exhibiting heretofore unknown expertise in al Qaida recruitment strategies, the court posits that "[s]uch a recruiting tactic (or cover story)" would make sense. *Id.* "Latif's medical records and his professed desire for medical treatment," the court thus *finds*, "are therefore consistent with the Report, not inconsistent." *Id.* at 28. *But see United States v. Microsoft*, 253 F.3d 34, 117 (D.C. Cir. 2001) (en banc) ("[D]istrict court factfindings receive either full deference under the clearly erroneous standard or they must be vacated. There is no de novo appellate review of factfindings and no intermediate between de novo and clear error, not even for findings the court of appeals may consider sub-par.").

## C

The government points to several additional pieces of evidence that, it believes, buttress its argument that the Report is reliable. The district court considered all of this evidence. Some items it found insufficient to outweigh its concerns about the Report and its positive assessment of Latif's story. Others it found failed to implicate Latif or prove the point the government hoped to make. As a reviewing court, our job is to determine only whether those assessments were clearly erroneous. They were not.

First, consider the circumstances leading up to Latif's seizure by Pakistani authorities—circumstances to which the district court gave less weight than the government would

~~SECRET~~ 33 ~~SECRET~~

have liked. Latif left Kabul in November 2001 and then traveled through Jalalabad before eventually arriving at the Pakistani border where Pakistani authorities detained him. According to the government, this path mirrors that of Taliban soldiers retreating from Kabul. Although not contending that this evidence is dispositive, the government argues that because Latif's admitted route is consistent with that of Taliban soldiers and with information in the Report, it is a helpful piece in the puzzle, bolstering its claim that the Report's inculpatory statements are accurate.

Fair enough, but how helpful? If this route is commonly used by innocent civilians, then the evidence is not that helpful at all. To understand why, consider a simple hypothetical. Suppose the government were to argue in a drug case that the defendant drove north from Miami along I-95, "a known drug route." Familiar with I-95, we would surely respond that many thousands of non-drug traffickers take that route as well. Given what we know about our own society, the I-95 inference would be too weak even to mention. *Cf. Almerfedi*, 2011 WL 2277607, at *4 n.7 (noting that some conduct such as possessing an AK-47 is so "commonplace in Afghanistan [that it] does not meaningfully distinguish an al Qaeda associate from an innocent civilian"). On the other hand, if the alleged drug trafficker had driven along an infrequently traveled country road, then a contention that that road was "a known drug route" would carry more weight. The burden of proof is on the government to demonstrate whether travel on a particular route to the Pakistani border, when considered in context, is more like the lonely country road and thus worthy of consideration when it comes to distinguishing between enemy combatants and innocent civilians.

Based on nothing more than a few anecdotes, this court suggests that Latif's route was akin to the country road. It asserts that the details of Latif's post-Kabul travels are "analogous" to those we found "strong[ly] suggest[ive]" of al Qaida membership in *Uthman*. Maj. Op. at 47. But how analogous are they really? Uthman was captured "in .the vicinity of Tora Bora" at a time when "most, if not all, of those in the vicinity of Tora Bora . . . were combatants." *Uthman*, 637 F.3d at 404. By contrast, the record in this case contains no evidence that Latif ever traveled through the Tora Bora mountains, and the city we know he did travel through—Jalalabad—has over 160,000 residents, most of whom were presumably not combatants, *see Jalalabad*, Britannica Academic Edition, http://www.Britannica.com/EB checked/topic/299643/Jalalabad (last visited Sept. 20, 2011) (estimating population as of 2006 at 168,600). In *Uthman*, the detainee had not only taken a particularly suspicious route, but also was captured with a "small group" that included two "confessed . . . bodyguards for Osama bin Laden" and another admitted Taliban fighter, all three of whom Uthman had studied with at the Furqan Institute, "a religious school at which other men were recruited to fight for Al Qaeda." *Uthman*, 637 F.3d at 404–05 (internal quotation marks omitted). One of the bodyguards "described the group as 'brothers' retreating from battle.' " *Id.* at 405. Here, Latif told interrogators that his Afghan guide was the only person who accompanied him to the Pakistani border, Ex. 25, Summary Interrogation Rep. (Mar. 6, 2002), and the only evidence to the contrary are ███████████████████████████

███████████████████████████ My colleagues accuse the district court of "fail[ing] even to consider" Latif's route. *Id.* at 42. But the district court did consider it, expressly acknowledging that "Abu Khalud arranged travel for other detainees along the

SECRET 35 SECRET

same route Latif reportedly took to Afghanistan." *Latif*, slip op. at 10. Given that the government failed to demonstrate that route was towards the country road end of the I-95-country road continuum—i.e., that the evidence was sufficiently probative—the district court committed no clear error by failing to "factor[] [it] into [its] decision," Maj. Op. at 42.

Second, consider the government's argument that "Latif was recruited by an al Qaeda member" in Yemen, a theory the district court found the government had failed to prove. *Latif*, slip op. at 25. To support its theory, the government pointed to evidence allegedly showing that Latif's charitable benefactor, Ibrahim Alawi, is actually an al Qaida facilitator known as Abu Khalud, whose real name is Ibrahim Ba'alawi. Some of this evidence could certainly have led a reasonable factfinder to accept the government's interpretation, including that "Ba'alawi" and "Alawi" have similar spellings and that the route Latif took to Afghanistan at Ibrahim's urging was the same path reportedly taken by other detainees who, unlike Latif, admit to having taken that trip to fight alongside the Taliban and some of whom have also admitted, again unlike Latif, to being Abu Khalud-recruits. That evidence, however, hardly forecloses the district court's contrary finding that the government had failed to prove by a preponderance of the evidence that Ibrahim Alawi was Abu Khalud. To repeat, although we have treated evidence that a petitioner reached Afghanistan along a "route similar to the paths of admitted al Qaeda members now in U.S. custody" as a plus factor in determining whether that petitioner was "part of" al Qaida, *Uthman*, 637 F.3d at 405, we have never suggested nor has the government shown that this particular path is so uniquely associated with al Qaida recruits that a district court clearly errs when it treats such evidence as more akin to traveling along I-95 than a lonely country road.

The record contains ample additional evidence that supports the district court's finding. Latif introduced expert declarations explaining that "Ba'alawi" and "Alawi" are distinct Arabic names and that both are common in Yemen. *Latif,* slip op. at 18–19. Notably, therefore, Latif's interrogation summaries all refer to some variation of the name Ibrahim Alawi but none include the "Ba," and none mention Abu Khalud. By contrast, interrogation summaries for seven of the eight detainees mentioning the al Qaida facilitator named Abu Khalud refer either to "Abu Khalud" or "Ibrahim Ba'alawi" but never "Ibrahim Alawi," *id.,* and the eighth, who apparently used the name "Alawi," is a detainee this very district court, in a different case, found not credible because his statements conflicted with those of several other detainees, *id.* at 19 n.10 (citing *Abdah v. Obama,* 717 F. Supp. 2d 21, 35 (D.D.C. 2010)). *But see* Maj. Op. at 39–41 (ignoring the district court's adverse credibility finding about that detainee). Moreover, Latif described Ibrahim to interrogators as "skinny," with a "big beard" and as "30–40 yrs. old," as having two children—██████ a boy, and ██████ a girl, and as being from Ibb. *Latif,* slip op. at 19–20. By contrast, other detainees described Abu Khalud as short, fat, with a short beard and moustache, and around 27 years old, with a visible injury on his face caused by a bullet injury sustained in Bosnia, with one daughter named ██████ and as being from Ta'iz, not Ibb. *Id. But see* Maj. Op. at 50 (dismissing these differences because Latif's descriptions of Ibrahim Alawi appear in interrogation summaries produced after Latif's initial interview). In light of this mixed record it is self-evident that "there are two permissible views of the evidence," meaning that "the factfinder's choice between [those two views] cannot be clearly erroneous." *Awad,* 608 F.3d at 7.

~~SECRET~~ 37 ~~SECRET~~

Next, consider record evidence that, according to this court, shows "that Latif stayed at al-Qaida guesthouses." Maj. Op. at 45. That evidence consists of ███████████ ████████████████████████ which the government claims include ██████ The contain ████████ ███████████ along with █ Seeking to connect these ███ to ███ the government argues that the ██████████████████████████ the ████████████████████████████ and the ████████████████████████████████ The government also points to an ████████████████████ ████████████████████ Finally, the government contends that the fact that ██████████████ ██████ buttresses its ██████████████ given its theory that the ██ contain ████████████ ████████████████████████████

But the district court found that the ████ the government points to "is not ██████████████████████ The district court based that finding on the differences between ████████████████ and the ██████████████ as well as the fact that ██████ is not ██████████████ The district court also noted Latif's innocent explanation for not having his passport—that he "gave it to Ibrahim to use in arranging his stay at a hospital." *Id.*

Ample record evidence supports the district court's factual analysis. At the most basic level, as the district court noted, ████████████████████████████████ ████████████████████████████ Moreover, ██████████████████████████████ explaining that even the apparent ████████ between the ████████ ██████████████████████ is misleading given that ████████████████████████████████

SECRET 38 SECRET

Indeed,

implying

In addition, as

This court nonetheless accuses the district court of overlooking the government's expert evidence that

By that theory, Latif could be any

and maybe he goes

But the district court committed no clear error when, after considering the

it concluded that

Finally, the district court's reliance on Latif's explanation for not having his passport is plausible in light of other record evidence about the practice of at least one hospital, the Islamic Hospital in Jordan, of taking foreign patient's passports "to guarantee that [those] patients will not leave the country before settling their bills." Pet'r Trial Ex. No. 7. Moreover, although leaving behind one's passport with an al Qaida operative at an al Qaida run guesthouse might suggest al Qaida affiliation, *see Al Alwi*, 2011 WL 2937134, at *4,

such a scenario is several inferential steps removed from the only relevant fact we know about Latif—that he did not have his passport with him when seized. To be sure, a reasonable factfinder might have interpreted this evidence differently. Yet again, the record contains enough evidence to support "two permissible views of the evidence," *Awad*, 608 F.3d at 7 (quotation omitted), meaning that "the factfinder's choice between [those two views] cannot, [therefore,] be clearly erroneous." *Id.*

### D

The court groups many of its criticisms about the district court's fact finding under the catch-all header of *Al-Adahi*. According to my colleagues, the district court took an "unduly atomized" approach to the evidence. Maj. Op. at 39. The district court did no such thing.

Absent some affirmative indication to the contrary, we "presum[e] that the district court knew and applied the law correctly." *United States v. Mouling*, 557 F.3d 658, 668 (D.C Cir. 2009). Such affirmative evidence of legal error was quite obviously present in *Al-Adahi*, as the "fundamental mistake" we identified in that district court's opinion makes clear:

> Al-Adahi's ties to bin Laden "cannot prove" he was part of Al-Qaida and this evidence therefore "*must not distract* the Court." The fact that Al-Adahi stayed at an al-Qaida guesthouse "is not *in itself* sufficient to justify detention." Al-Adahi's attendance at an al-Qaida training camp "is not sufficient to carry the Government's burden of showing he was a part of" al-Qaida.

SECRET 40 SECRET

*Al-Adahi*, 613 F.3d at 1105 (emphasis added) (quoting district court opinion). By contrast, here the district court placed the Report, which the government concedes represents its "primary" piece of evidence, Appellants' Br. 10, and on which the government admits its "case turned," Appellants' Br. 5, at the center of its analysis. The district court devoted two and a half pages to analyzing the Report and then another fifteen pages to summarizing other evidence introduced by the parties to prop it up or knock it down. Finally, the district court examined the cumulative effect of various evidentiary concerns on the Report's reliability. When read in its full context, the district court's opinion suffers from nothing like the flaws that we reviewed in *Al-Adahi*.

This court uses *Al Adahi* to turn the presumption of district court lawfulness on its head. Rather than giving the district court the benefit of the doubt, it seems to assume that the district court considered the evidence in isolation and ignored key facts. Take, for example, the contention that the district court tossed aside and considered in isolation alleged inconsistencies between statements attributed to Latif in different interrogation reports. Maj. Op. at 43–45. This argument fails to recognize the leeway we have afforded district courts to resolve discrepancies among various accounts in other Guantanamo cases. In *Al-Madhwani*, we found no error in the district court's decision to credit two different detainees' interrogation summaries even though the detainees' statements contradicted each other in certain respects, reasoning that the "task" of "resolving" such discrepancies "quintessentially" belonged to the district court. *Al-Madhwani*, 2011 WL 2083932 at *5. Yet the only indication that the district court in that case had actually resolved the relevant contradictions between the two reports is its bald assertion that those reports are reliable; the discrepancies are never mentioned, let alone analyzed. By

~~SECRET~~ 41 ~~SECRET~~

contrast, as this court concedes, the district court here expressly noted that it had "taken into consideration the explanation of events Latif has offered" in assessing the Report and expressly acknowledged that Latif's story is not without "inconsistencies and unanswered questions." Maj. Op. at 42. The district court then specifically assessed the two primary inconsistencies the government relied on, as my colleagues implicitly acknowledge. *Id.* at 43–45. Finally, the district court explained that any concern about "smaller inconsistencies," most of which it had earlier summarized, was outweighed by the possibility that they had resulted from translation or transcription errors and by the fact that the "fundamentals [of Latif's story] have remained the same." *Latif,* slip. op. at 27. For its part, this court reluctantly recognizes all this as "a welcome step toward the holistic approach to the evidence we called for in *Al-Adahi.*" Maj. Op. at 42–43. But it is in fact more than that. If the district court's implicit resolution of discrepancies in *Al-Madhwani* was adequate, then it follows *a fortiori* that so too was this district court's far more explicit treatment. My colleagues acknowledge that their approach is in tension with "the usual practice" of "assum[ing] the [district] court considered all the evidence," but nonetheless find this justified by the "unusual posture of this case"—i.e., a he-said, she-said case involving detainees at Guantanamo Bay. *Id.* at 50. But if we take seriously the notion that district courts are better at finding facts and determining credibility, then we should be all the more eager to defer to their expertise when the stakes are high and when the case comes down to he-said, she-said—that is, when it rests entirely on credibility and how one interprets the facts.

The only affirmative indication this court identifies allegedly showing that the district court took an unduly atomized approach to the evidence relates to the

~~SECRET~~ 42 ~~SECRET~~

circumstances of Latif's capture and to ███████████████ ███████████████ The court makes much of the fact that in weighing the former, the district court employed language similar to the language used at one point by the district court in *Al-Adahi*—specifically that "the timing of [Latif's] departure . . . *is not sufficient* to create an inference that he was involved in fighting." *Latif*, slip op. at 27 (emphasis added). The court, however, neglects to mention that this sentence appears in the middle of a paragraph evaluating the credibility of Latif's account, which itself appears in the middle of an extended assessment of the *combined* impact of multiple pieces of evidence on the Report's reliability. This "pars[ing]" of the district court's words "overlook[s]" what those words "mean[] in context," an approach that is, again, inconsistent with clear error review. *See Brockenborrugh*, 575 F.3d at 741.

As for the district court's decision ███████████ ████████████████████████████████ my colleagues offer no convincing explanation for why the district court should have considered evidence that it found does not implicate Latif—unless, of course, that finding was clearly erroneous, something they never claim. Suppose, for example, that a witness in a burglary case testifies to having seen a man with a similar build as the defendant walk away from the site of the crime. If the factfinder concludes that the person the witness saw was not the defendant, then surely the factfinder can reasonably set aside the witnesses' testimony in assessing whether the defendant was the burglar. So too here. Once the district court had determined that ███████ did not implicate Latif, it was entirely proper for it to put them aside when evaluating the rest of the evidence.

The remainder of the court's *Al Adahi* critique rests entirely on the claim that the district court "ignore[d] relevant

evidence." Maj. Op. at 38. Not so. The district court expressly considered virtually all the evidence this court points to—including every single item of evidence the government claims is of primary or even secondary relevance. *Compare id.* at 39–41 ("correspondence" between names appearing in the Report and names Latif later mentioned to interrogators), *with Latif,* slip op. at 15–16 (discussing same); *compare* Maj. Op. at 41–42 (Latif's travel route from Yemen to Afghanistan), *with Latif,* slip op. at 10–11 (discussing same); *compare* Maj. Op. at 42–45 (purported inconsistencies in Latif's statements), *with Latif,* slip op. at 27–28 (discussing same); *compare* Maj. Op. at ███████████████████████████████████████

██████████ *compare* Maj. Op. at 47–49 (circumstances of Latif's departure from Kabul and subsequent seizure by Pakistani authorities), *with Latif,* slip op. at 12–13, 25, 27 (discussing same); *compare* Maj. Op. at 50–52 (evidence that Latif's benefactor, Ibrahim Al-Alawi, is in fact the Al Qaida facilitator Abu Khalud), *with Latif,* slip op. at 17–21, 23–28 (discussing same). As for the claim that Latif may have (or may not have) traveled across the Pakistani border with Taliban-affiliated men, the district court's silence is easily explained: ██████████████████████████████████████████████████████ both of which already chosen not to credit. *But see* Maj. Op. at 45–46 (unreflectively treating this omission as an error distinct from the district court's analysis of the Report).

To determine, as this court apparently does, that an experienced district court judge has totally ignored relevant evidence and so committed legal error because his twenty-seven page opinion omits mention of a handful of tertiary items plucked from thousands of pages of record evidence not

only ignores the presumption of district court lawfulness, but also imposes on that court a virtually impossible burden. As the First Circuit put it, "[t]he district court could have written a 200-page decision on this case, but the far more compact assessment it made was entirely adequate under Rule 52(a)." *Addamax Corp. v. Open Software Foundation, Inc.*, 152 F.3d 48, 55 (1st Cir. 1998) ("[T]he district court was not required to make findings on every detail, was not required to discuss all of the evidence that supports each of the findings made, and was not required to respond individually to each evidentiary or factual contention made by the losing side."). *See also Schilling v. Schwitzer-Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944) ("While counsel may be disappointed that findings do not discuss propositions sincerely contended for, that, alone, does not make them inadequate or suggest that such propositions were not understood by the court."); *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed Cir. 1986) ("We presume that a factfinder reviews all the evidence presented unless he explicitly expresses otherwise."); *cf. Puerto Rico Maritime Shipping Authority v. Federal Maritime Comm'n*, 678 F.2d 327, 351 (D.C. Cir. 1982) ("It is frivolous to contend that the Commission did not consider the evidence because it did not catalogue every jot and tittle of testimony. Nothing is gained by a laundry-list recital of all evidence on the record supporting each view on every issue.").

The district court's opinion is by no means perfect. But clear error review demands a good deal less than perfection. *See Microsoft*, 253 F.3d at 118. That said, had the district court otherwise committed legal error or made some other mistake requiring remand, then I would have asked it to clarify whether it had indeed considered this evidence holistically. *See, e.g., Salahi*, 625 F.3d at 753 (noting that "the district court generally" considered all the evidence together but that "its consideration of certain pieces of evidence *may*

SECRET                    45                    SECRET

have been unduly atomized" and that "*since* we [were] remanding" we would encourage the district court to clarify (emphasis added)). But nothing in our case law requires, nor would I now hold, that the mere fact that a district court that obviously and carefully considered the entire record failed to mention a couple items of tertiary importance reflects *undue* atomization of the evidence.

## III.

For the foregoing reasons, I would affirm the grant of the writ of habeas corpus.